787 So.2d 588 (2001)
Keith FONTENOT
v.
SOUTHWESTERN OFFSHORE CORPORATION, et al.
No. 00-1722.
Court of Appeal of Louisiana, Third Circuit.
June 6, 2001.
*589 Jeffrey Michael Bassett, James P. Ryan, Patrick Craig Morrow, Jr., Morrow & Morrow, Opelousas, LA, Counsel for Keith Fontenot.
Michael Anthony McGlone, Lemle, Kelleher, LLP, New Orleans, LA, Counsel for Indemnity Insurance Company of North America, Southwestern Offshore Corporation, Pennzoil Exploration and Production Company and A & W Louisiana, Inc.
William Monroe Quin, II, Lemle & Kelleher, LLP, New Orleans, LA, Counsel for Indemnity Insurance Company of North America, Southwestern Offshore Corporation, Pennzoil Exploration and Production Company and A & W Louisiana, Inc.
John Powers Wolff, III, Keogh, Cox, Baton Rouge, LA, Counsel for Baker Marine Corporation.
*590 Barry Louis Domingue, The Juneau Firm, Lafayette, LA, Counsel for CIGNA Insurance Company.
Court composed of DOUCET, Chief Judge, COOKS, SAUNDERS, AMY and PICKETT, Judges.
AMY, Judge.
A seaman filed suit against the defendants for damages resulting from an injury allegedly occurring while working as a mud engineer on an offshore oil and gas drilling rig. The trial court found the seaman to be seventy-five percent at fault in causing the accident and awarded him general damages, past and future medical expenses, and lost wages. The seaman appealed. For the following reasons, we affirm the judgment of the trial court.

Factual and Procedural Background
This matter arises out of an accident occurring on an oil and gas drilling rig situated more than three miles off the coast of Louisiana. All parties to this matter stipulated that at the time of the alleged accident, Pennzoil Exploration and Production Company (Pennzoil) had entered into contracts with both Southwestern Offshore Corporation (Southwestern) for the use of Southwestern Rig 151 and its crew, and Chemrich Incorporated under a separate Master Service and Supply Agreement.
The plaintiff, Keith Fontenot, was employed as a mud engineer with Chemrich and was assigned to work on Rig 151. Mr. Fontenot testified that in the early morning of February 2, 1996, activity in the rig's mudroom was moving at a hectic pace because the drilling mud had received an intrusion of gas from the well which caused a potentially dangerous situation. On his way to get chemicals to add to the drilling mud, Mr. Fontenot struck his head on a pipe causing him to fall to the floor. The pipe was approximately one foot in diameter and hung approximately fifty-six inches from the deck of the mudroom. Although he was wearing his hard hat at the time of the incident, Mr. Fontenot explained that he felt a shooting pain in his left hand and fingers after he bumped his head. Mr. Fontenot reported the accident to a Pennzoil supervisor and went to rest for three to four hours. Upon his return to the mudroom at about 7:00 p.m., Mr. Fontenot was involved in a second incident wherein he again hit his head on the same pipe while trying to walk beneath it.
On May 1, 1997, Mr. Fontenot filed suit against Southwestern and Pennzoil under general maritime law for the damages he allegedly suffered to his back and spine as a result of the accident occurring on the rig. This matter proceeded to trial on January 3, 2000, after which the trial court assessed Mr. Fontenot with seventy-five percent of the fault in causing the accident, Southwestern with the remaining twenty-five percent, and found Pennzoil free from fault. The trial court awarded $200,000.00 in general damages, $107,044.09 in past medical expenses, $1,000.00 in future medical expenses, $222,947.00 in past lost wages, $126,982.00 in future lost wages, for a total damage award of $657,973.09. Mr. Fontenot's damages were reduced according to the percentage of fault assigned to him for a final award of $164,973.00. Further, the trial court awarded CIGNA, Chemrich's workers' compensation insurer, $264,416.00 in satisfaction of its lien on judgment which had been raised through its intervention into this matter.
Mr. Fontenot appealed the trial court's judgment asserting the following assignments of error:
1) The trial court erred in finding Keith Fontenot's comparative fault to be 75% under the rules applicable to a comparative fault analysis.

*591 2) The trial court erred in failing to use the same base wage in computing future lost wages that it used in awarding past lost wages.
3) The trial court erred in not finding Pennzoil to be at fault.

Discussion of the Merits

Apportionment of Fault
Mr. Fontenot begins by arguing that the trial court erred in finding him seventy-five percent at fault in causing the accident. In support of his contention, Mr. Fontenot proposes that an analysis of the facts presented in this case, with the factors established in Watson v. State Farm Fire & Cas. Ins. Co., 469 So.2d 967 (1985) for apportioning fault, demonstrates that Southwestern should have been apportioned with a greater percentage of the fault. He claims that Southwestern had essentially created the hazardous condition when it removed guardrails that had once blocked the pathway under the pipe. Thereafter, Southwestern became aware of the hazard that the low-hanging pipe presented after receiving numerous complaints from employees who had hit their head on the pipe when trying to walk beneath it. Additionally, Mr. Fontenot asserts that not only was Southwestern responsible for curing the hazardous condition but that it was in a superior position with respect to preventing these types of injuries.
Conversely, Southwestern, also using the Watson factors, argues that it was Mr. Fontenot's own inadvertence that caused his injuries. It asserts that Mr. Fontenot had worked in the mudroom for over a year and was familiar with the location, size, and height of the pipe. Further, Mr. Fontenot was also aware of an alternative route to reach the other side of the mudroom which did not require him to walk beneath the pipe and would have only taken him twelve to fifteen extra seconds to complete. Thus, Southwestern concludes, the trial court did not err in apportioning Mr. Fontenot with the greater percentage of fault.
In an action for injury or loss, the trier of fact shall determine the degree or percentage of fault of all persons found to have contributed or caused that injury or loss. La.Civ.Code art. 2323. When apportioning fault, the factfinder should consider the five factors enunciated in Watson, which include: 1) whether the conduct resulted from inadvertence or involved an awareness of the danger; 2) how great a risk was created by the conduct; 3) the significance of what was sought by the conduct; 4) the capacities of the actor, whether superior or inferior; and, 5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. Watson, 469 So.2d 967. See Joseph v. Broussard Rice Mill, Inc., 00-628 (La.10/30/00); 772 So.2d 94. The findings of percentages of fault are factual determinations, which will not be disturbed in the absence of manifest error. Duncan v. Kansas City Southern Railway Co., 00-66 (La. 10/30/00); 773 So.2d 670; Clement v. Frey, 95-1119 (La.1/16/96); 666 So.2d 607.
In the instant matter, both Mr. Fontenot and the defendants have set forth persuasive arguments using the applicable Watson factors in support of their contentions that the opposing party should bear the greater percentage of fault in causing Mr. Fontenot's accident. We find however, that these arguments contain the same factors that were presented to the trial court prior to its rendering judgment in this matter. After review, we conclude that Mr. Fontenot has failed to demonstrate that the trial court did not consider the competing factors alleged by the parties *592 to have caused Mr. Fontenot's accident or that the trial court's allocation of fault in this matter was manifestly erroneous and/or clearly wrong. Therefore, this factual finding by the trial court will not be disturbed on appeal.

Calculating Lost Wages
In his second assignment of error, Mr. Fontenot argues that the trial court erred by failing to use the same base wage in computing his award for future wage loss as it used in computing his past lost wages.
At trial, the court was presented with two different calculations from the parties respective economists as to the appropriate base wage to be used in calculating Mr. Fontenot's claims for past and future lost wages. Mr. Fontenot's economist, Dr. Bernard Pettingill, Jr., calculated Mr. Fontenot's base wage rate at the time of injury to be $83,567.00, the amount of Mr. Fontenot's gross earnings in the year prior to the accident. The defendants' economist, Dr. Kenneth Boudreaux, did not use Mr. Fontenot's most recent year of earnings, but took an average of Mr. Fontenot's earnings for the five years prior to his accident and determined that he had a base wage rate of $36,923.00. In deciding to use a five-year average salary, Dr. Boudreaux explained:
After having received the 1995 income tax return, it was my conclusion in looking at the history of his income that it would be appropriate to take an average that would run from 1990 when he earned the second highest income that he earned through 1995, when he earned the highest income that he earned.
If you take an average over that period of time, you'd get thirty-six thousand, nine hundred and twenty-three ($36,923) dollars per year before tax. On a year to year basis, the amount of income that he earned was a little less than thirty-six thousand ($36,000) in 1990, approximately thirty-three thousand ($33,000) in '91, approximately eleven thousand ($11,000) in '92, twenty-three thousand ($23,000) in '93, thirty-seven thousand ($37,000) in '94 and seventy-eight and a half thousand ($78,500) in '95.
I should probably mention the reason why I think it's appropriate to take an average is the function of two (2) things, both the obvious variability in Mr. Fontenot's income over the period for which we have records. In other words, his income was not steady income every year the way it would be for a regular salaried worker.
Secondly, the industry in which he was employed is subject to very substantial volatility in terms of the amount of work available. And some kind of an averaging process, in my opinion, is appropriate because of that.
It is evident from a comparison of the awards for past and future lost wages with the testimony of each parties economists that the trial court accepted the calculations of Dr. Pettingill on the issue of past lost wages and adopted Dr. Boudreaux's calculations for future lost wages. Mr. Fontenot argues that if the trial court accepted Dr. Pettingill's opinions as to past lost wages, then it should have accepted his calculations for future lost wages which were based on the same wage rate. We disagree that the trial court was required to do so.
Past and future lost wages are separate and distinct damage awards. In order to recover for past lost wages, a plaintiff must prove his past lost earnings and the length of time absent from work which is attributable to the injury caused by the defendant. Mathews v. Dousay, 96-858 (La.App. 3 Cir. 1/15/97); 689 So.2d 503. An award for past lost wages is *593 susceptible of mathematical calculation from the evidence presented at trial. Id.
To recover an award for future loss of earnings, the plaintiff must present medical evidence that indicates with reasonable certainty that a residual disability causally related to the accident in question exists, which results in the plaintiffs inability to earn wages to the same extent he could have earned had he not been injured. Id.
In addressing the issue of calculating future lost wages in maritime cases, a panel of this court in Jenkins v. Kerr-McGee Corp., 613 So.2d 1097, 1104 (La.App.3 Cir.1993), writ denied 616 So.2d 701 (La. 1993), writ denied 616 So.2d 702 (La.1993) explained:
It is well settled that future lost wage calculations in maritime cases are to be performed in compliance with the method set forth in Culver v. Slater Boat Co., 722 F.2d 114 (5th Cir.1983) (en banc), cert. denied sub nom., Heinrich Schmidt Reederei v. Byrd, 467 U.S. 1252, 104 S.Ct. 3537, 82 L.Ed.2d 842 (1984), commonly known as Culver II. This case established a four step process for determining lost wages as follows:
(1) Estimate the loss of work life resulting from injury;
(2) Calculate the lost income stream;
(3) Compute the total amount of damages;
(4) Discount the total amount to its present value.
The lost income stream is calculated by adding gross income at the time of injury to other income (fringe benefits) then subtracting required payments by the wage earner (such as taxes and work expenses).
In this case, both Dr. Pettingill and Dr. Boudreaux purported to use the Culver factors in reaching their respective calculations of Mr. Fontenot's future lost wages. Nevertheless, the two experts reached vastly different resulting amounts, mainly because of the different wage rates used in their calculations.
On appeal, the defendants do not dispute the trial court's award of past lost wages to Mr. Fontenot. However, they assert that it was appropriate for the trial court to use the averaged wage rate proposed by Dr. Boudreaux when determining future lost wages for Mr. Fontenot, who is not a regularly salaried employee. As Dr. Boudreaux explained, a review of Mr. Fontenot's past income evidences that while working as a mud engineer in the five years prior to his accident, his salary for four of those five years was substantially less than his income at the time of injury. Dr. Boudreaux claimed that the variance in salary is directly attributable to the volatility of the oil and gas industry. Thus, Dr. Boudreaux opined that using an average wage rate of Mr. Fontenot's previous five years would be a more accurate way to project future lost earnings in comparison to taking Mr. Fontenot's highest years income.
When opinions of expert witnesses differ, it is for the trier of fact to determine the most credible evidence and these determinations will not be overturned unless it is proven that the expert's stated reasons are patently unsound. Sportsman Store of Lake Charles, Inc. v. Sonitrol Security Systems of Calcasieu, Inc., 99-201 (La.10/19/99); 748 So.2d 417. Accordingly, we find that reasonable evidence is provided in the record to support the trial court's award for future lost earnings in this case. Although the trial court accepted the opinion of Mr. Fontenot's economist as to the issue of past lost wages, we do not find that it was clearly wrong for the trial court to use an average wage rate as proposed by Dr. Boudreaux *594 in calculating future lost wages in light of the fact that there was evidence of a substantial variation in Mr. Fontenot's salary in the years prior to his injury. Hence, we affirm this portion of the judgment.

Liability of Pennzoil
Lastly, Mr. Fontenot asserts that the trial court erred in finding Pennzoil free from fault in causing his accident. He claims that a Pennzoil representative, Juan Garza, was working on Rig 151 and received complaints about the pipe from several employees prior to Mr. Fontenot's accident. Mr. Garza testified that he did in fact receive several complaints about the placement of the pipe and had suggested to Southwestern that the location of the pipe be modified. Mr. Fontenot alleges that Mr. Garza "should have done more" to eliminate the hazardous condition the pipe presented and his failure to do so was a breach of Pennzoil's duty to provide a safe workplace.
Generally, a principal is not liable for the offenses committed by an independent contractor, unless the independent contractor is performing ultrahazardous work or if the principal reserves the right to supervise or control the work of the independent contractor. Prater v. Porter, 98-1481 (La.App. 3 Cir. 3/3/99); 737 So.2d 102. Mr. Fontenot does not argue that Southwestern was not an independent contractor, or that Pennzoil reserved the right to supervise or control Southwestern's work. Rather, Mr. Fontenot merely asserts that Mr. Garza, as an agent of the principal should have done more by trying to persuade Southwestern to remedy the hazard presented by the pipe.
Considering the argument presented by Mr. Fontenot, we conclude that the trial court was not clearly wrong in finding Pennzoil free from fault in causing Mr. Fontenot's accident. Although there is evidence that Mr. Garza, an employee of Pennzoil, knew of the various incidences involving the low-hanging pipe, Mr. Fontenot has not demonstrated that Pennzoil maintained control over Southwestern to such a degree that would sustain a finding of negligence on its behalf, as principal, for the acts or omissions of its independent contractor, Southwestern. Therefore, we find this assignment of error meritless.

DECREE
For the above reasons, the judgment of the trial court is affirmed. All costs of this appeal are assessed against the plaintiff/appellant, Keith Fontenot.
AFFIRMED.
COOKS, J., dissents and assigns reasons.
SAUNDERS, J., dissents and assigns written reasons.
COOKS, J. dissenting.
I respectfully dissent from the portion of the majority opinion that affirms the trial court's apportionment of fault and its award of future lost wages.
A review of the evidence shows a majority of the fault should have been attributed to Southwestern. Steve Killingsworth, an engineer, was of the opinion that the overhead obstruction created by the pipe created a dangerous condition. The original designers of the rig did not intend the area where the pipe was located to be a walkway. Using its own personnel, Southwestern removed handrails that were placed on both sides of the pipe and added grating to create a walkway. However, to cross underneath the pipe, a worker had to "duck."
Numerous fellow employees testified, although they were familiar with the pipe and its location in the mudroom, they also *595 occasionally struck their heads on the pipe. Randy McAllister stated that "[a]ny derrick hand that worked in that pit room ... I promise you, they've hit their head on it." Two supervisors on the drilling rig, Juan Garza and Herbert Fusilier, testified they were aware of the hazard presented by the pipe and recommended it be eliminated.
A correct application of the factors set forth in Watson v. State Farm, 469 So.2d 967 (La.1985), demonstrates the trial court was manifestly erroneous in its apportionment of fault. Southwestern was aware of the hazard created by the pipe, yet did nothing to remedy it. In fact, as the record establishes, Southwestern created the walkway by removing the handrails from around the pipe in an attempt to create a shortcut. While this may have created a shortcut, it also created a hazard for which Southwestern should be held substantially liable.
I also find the trial court erred in failing to use the same base wage in computing the future wage loss as was used in computing the past wage loss. I find no reasonable basis for the trial court to award $222,947.00 in past lost wages, yet award only $126,982.00 in future lost wages. Both vocational experts that testified stated Mr. Fontenot will never earn anything close to the wages he was earning prior to the accident.
In conclusion, I would assign greater fault to Southwestern, and correspondingly, lower the fault allocated to Mr. Fontenot. I would also increase the amount of future lost wages awarded.
SAUNDERS, J. dissenting.
I respectfully dissent from the portion of the majority opinion affirming the trial court's apportionment of fault and its award of future lost wages. In doing so, I adopt the reasons stated by Judge Cooks in her dissent. However, I would apply the momentary forgetfulness doctrine so as to relieve Mr. Fontenot of the comparative fault attributed to him by the trial court.
Momentary forgetfulness does not always constitute negligence. Hill v. Lundin & Associates, Inc., 243 So.2d 121 (La. App. 1 Cir.1970), reversed on other grounds, 256 So.2d 620, 260 La. 542 (La. 1972). Under the momentary forgetfulness doctrine,
When a person has exercised the care and caution which an ordinarily prudent person would have exercised under the same or similar circumstances, he is not negligent merely because he temporarily forgot or was inattentive to a known danger. To forget or to be inattentive is not negligence unless it amounts to a failure to exercise ordinary care for one's safety. Regard must be had to the exigencies of the situation, and the circumstances of the particular occasion.
`Circumstances may exist under which forgetfulness or inattention to a known danger may be consistent with the exercise of ordinary care, as where the situation requires one to give undivided attention to other matters, or is such as to produce hurry or confusion, or where conditions arise suddenly which are calculated to divert one's attention momentarily from the danger. A lapse of memory, to excuse forgetfulness of a known danger, need not, as a general rule, be induced by a sudden disturbing cause in the sense of some startling event momentarily driving memory from the mind and causing forgetfulness.
`Generally, a lesser degree of prudence may be sufficient to constitute ordinary care where plaintiff's attention is distracted by a natural and usual cause, particularly where the distraction is placed there by defendant or where defendant in the exercise of ordinary care *596 should have anticipated that the distraction would occur. While diverting circumstances in general or standing alone are not sufficient to negative contributory negligence, the nature of the diverting circumstances must be considered with respect to the entire circumstances of each particular case.
`In order to excuse forgetfulness of, or inattention to, a known danger, some fact, condition, or circumstance must exist which would divert the mind or attention of an ordinarily prudent person; mere lapse of memory is not sufficient, and, if, under the same or similar circumstances, an ordinarily prudent person would not have forgotten or have been inattentive to the danger, such conduct constitutes negligence.'
Id. at 122-123 (quoting 65A C.J.S. Negligence s 120(2)).
The momentary forgetfulness doctrine should be applied when circumstances exist that produce "hurry or confusion" or "divert one's attention momentarily from the danger." See Soileau v. South Central Bell Tel. Co., 406 So.2d 182 (La.1981)(Louisiana Supreme Court reinstated the trial court's award of $65,000 based on the finding that the plaintiff was using ordinary care at the time of the accident even though he did not remember the presence of a telephone wire until he became entangled in it.); Tracy v. Parish of Jefferson, 87-701, 523 So.2d 266 (La.App. 5 Cir.1988), writ denied, 530 So.2d 569 (La.1988)(Fifth Circuit found that plaintiff who had stepped on a water meter lid and who became injured when it gave way, was free from negligence even though he had previously stepped on the same water lid and it had moved.)
In the instant case, it is undisputed that at the time of the accident, the rig was experiencing a fluctuation in the weight of the mud (mudcut), which created a potential emergency situation. Hebert Fusilier, the Southwestern toolpusher, testified that a mudcut has the potential to cause a blow out if handled incorrectly. The testimony received at trial, including that of Keith Fontenot, Randy McAllister, Charles Hutchinson, and Herbert Fusilier, indicated that the mudcut experienced at the time of the accident increased the activity level of everyone in the mud-room. Furthermore, it is undisputed that the visibility in the mud-room was poor on the day of the accident. The visibility was lowered because of the steam in the mud-room. This steam fogged up the safety glasses worn by Mr. Fontenot, who testified that his vision was impaired by the steam both times he struck his head on the pipe. Because of the circumstances that existed at the time of the mudcut, the momentary forgetfulness doctrine should be applied to relieve Mr. Fontenot of comparative negligence or, at the very least, to reduce the percent of fault attributed to him as suggested by Judge Cooks in her companion dissent.