hAMY, Judge.
The plaintiff filed suit under the Jones Act and general maritime law, seeking recovery for injuries sustained while working aboard an oil rig. A jury found that the defendant offshore company was negligent and that the vessel was unseaworthy. However, the jury also found the plaintiff negligent and the plaintiffs negligence to be a legal cause of the injuries sustained. The plaintiff was apportioned ninety per *1248 cent of the fault. General damages, past lost earnings and future loss of earnings were awarded. The plaintiff appeals. For the following reasons, we affirm.
Factual and Procedural Background
The plaintiff, Carl Aycock, was an employee of ENSCO Offshore Company, working as a floorhand, at the time of the September 1997 work-related accident at issue. Mr. Aycock filed suit alleging that he sustained serious lower back injuries when he was struck from the rear by the lead tongs he was operating. He contends that the accident occurred after he released the tongs to assist a coworker unlatch backup tongs that had become jammed. He argues that ENSCO is responsible for the injuries under general maritime principles and the Jones Act due to what he contends were improperly hung tongs, which resulted in excessive swing, and a coworker not seeing what he should have seen and failing to prevent the tongs from striking him in the back. ENSCO denied responsibility, contending that the tongs causing the accident are designed to “swing” so that they may be operated by a single employee and that the operator is responsible for their control. At the time of trial, Mr. Aycock had not returned to work. He had undergone a three-level anterior lumbar fusion. Mr. Aycock’s medical expenses were provided by ENSCO.
The matter proceeded to trial, with a jury finding ENSCO liable due to Jones Act negligence and general maritime principles of unseaworthiness. ENSCO’s 12liability was allocated equally between these two theories. The jury also found the plaintiff comparatively negligent in causing his own injuries. Ninety percent of the fault was apportioned to the plaintiff, the remaining ten percent was apportioned to ENSCO. The jury awarded the following damages: $150,000 for past physical and mental pain and suffering; $50,000 for future physical and mental pain and suffering; $110,000 for loss of earnings to trial; and $33,000 for future loss of earnings. No award was made for future medical expenses.
The plaintiff filed a “Motion for Judgment Not Withstanding the Verdict, New Trial, and/or Additur.” In particular, the plaintiff argued that the $33,000 awarded by the jury for loss of future earnings was less than the lowest reasonable amount that could have been awarded and that the ninety percent apportionment of fault for his actions/inactions was excessive. The motion was denied.
The plaintiff appeals, assigning the following as error:
1. The jury’s finding the appellant 90% at fault is manifestly erroneous and not supported by the evidence presented at trial.
2. The trial court erred in denying the appellant’s motion for new trial and judgment notwithstanding the verdict.
3. The jury erred in awarding the appellant $33,000 for loss of future earnings.
4. The trial court erred in denying the appellant’s motion for additur.
Discussion

Allocation of Fault

The plaintiff sought recovery under general maritime principles of unseaworthiness and negligence under the Jones Act. On appeal, he questions both the jury’s determination that he was comparatively negligent and that, if negligent, his conduct was deserving of 90% of the fault for the accident. His Jones Act and | aunseaworthiness claims are premised on his allegation that his coworker, roustabout Thomas Macheck, was responsible *1249 for the spinner wrench at the time of the accident and that he should have seen the swinging tongs and signaled a warning so as to prevent the blow. He also contends that the tongs were improperly hung so as to create excessive swing when released. He contends that in light of the jury’s determination that ENSCO was responsible under both theories, equally apportioned between the two, that his actions in releasing the lead tongs to assist the rear tong operator should not be viewed as negligent. Accordingly, he asserts error in the finding of fault, the apportionment of fault, and in the denial of the JNOV.
The Jones Act, 46 U.S.CApp. § 688(a), provides:
Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply; and in case of the death of any seaman as a result of any such personal injury the personal representative of such seaman may maintain an action for damages at law with the right of trial by jury, and in such action all statutes of the United States conferring or regulating the right of action for death in the case of railway employees shall be applicable. Jurisdiction in such actions shall be under the court of the district in which the defendant employer resides or in which his principal office is located.
In Foster v. Destin Trading Corp., 96-803 (La.5/30/97); 700 So.2d 199 (on rehearing), the Louisiana Supreme Court noted that, although an employer’s liability may extend to all personal injuries arising during a seaman’s employment, proof of negligence is essential. Referencing the applicable federal jurisprudence, the supreme court explained:
Such negligence may arise in many ways including the failure to use reasonable care to provide a seaman with a safe place to work, the existence of a dangerous condition on or about the vessel, or any other breach of the duty of care. See Davis v. Hill Engineering, Inc., 549 F.2d 314, 329 (5th Cir.1977); 1 Thomas J. Schoenbaum, Admiralty and Maritime Law § 6-21, at 312 (2d ed.1994). The duty of care owed by an Lemployer under the Jones Act is that of ordinary prudence, namely the duty to take reasonable care under the circumstances. Gautreaux v. Scurlock Marine, Inc., 107 F.3d 331, 335-36 (5th Cir.1997). The seaman bears the evidentiary burden of proving that a breach of the duty owed by the employer was a cause of his injuries.
Id. at p. 3-4; 208.
Additionally, an owner of a vessel has an absolute duty, one not requiring negligence, to provide a seaworthy vessel. Vendetto v. Sonat Offshore Drilling Co., 97-3103 (La.1/20/99); 725 So.2d 474. The Louisiana Supreme Court has explained as follows with regard to this theory of recovery:
To state a cause of action for unseaworthiness, the plaintiff must allege an injury “caused by a defective condition of the ship, its equipment or appurtenances .... Members of the crew of a vessel are also warranted as seaworthy, and there may be liability for ... negligent orders, or for utilizing an understaffed or ill-trained crew.” 1 Thomas J. Schoenbaum, Admiralty and Maritime Law § 6-25, at 333-34 (2d Ed.1994). Whether a vessel is unseaworthy is a factual question to be decided on a case-by-case basis. Id.
[[Image here]]
*1250 Although the duty of seaworthiness is absolute and does not require negligence, the mere fact an accident occurred does not establish unseaworthiness. The plaintiff bears the burden of proving that “the unseaworthy condition played a substantial part in bringing about or actuahy causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness.” Foster v. Destin Trading Corp., 96-803, p. 7 (La.10/21/97); 700 So.2d 199, 209 (on reh’g)(quoting Johnson v. Offshore Express, Inc., 845 F.2d 1347, 1354 (5th Cir.1988)).
Id. at p. 14-15; 481-82.
Again, the jury found the defendant liable under both of the above theories. ENSCO’s fault was apportioned equally under theories of neghgence and unseaworthiness. As ENSCO has not filed an appeal or an answer, the jury’s finding in this regard is final. For purposes of our review, it is of no moment whether the jury found that the tongs carried excessive swing or that Mr. Ay-cock’s coworker failed to signal him that the tongs were swinging toward his back. Under both theories of | srecovery, the jury was required to consider the fault of Mr. Aycock. They found him to be negligent, assessing him with 90% of the fault. It is this determination that is appealed. While federal law is applicable to substantive issues in unseaworthiness and Jones Act cases, which is obvious from the federal jurisprudence relied on by the Louisiana Supreme Court in the previous excerpts, we conduct our review under the applicable state law standard of review, that of manifest error. Milstead v. Diamond M Offshore, Inc., 95-2446 (La.7/2/96); 676 So.2d 89.
In its original opinion in Foster, 96-803, p. 8-9; 700 So.2d at 204, the Louisiana Supreme Court explained as follows with regard to comparative negligence in unseaworthiness claims and Jones Act matters:
Comparative neghgence applies to both unseaworthy claims as well as Jones Act neghgence actions. Cormier, [640 So.2d] at 556. To prove comparative neghgence on the part of the plaintiff, the defendant has to show that the plaintiff was contributorily negligent and that such neghgence was a proximate cause of the resulting injury. Miles v. Melrose, 882 F.2d 976 (5th Cir.1989). The effect of finding neghgence on the part of a seaman seeking recovery in a seaworthiness action or Jones Act claim is only to reduce damages proportionately, but not to bar recovery. A seaman’s neghgence will not defeat his claim under the Jones Act and general maritime law but may be considered as comparative neghgence to mitigate damages in proportion to the degree of his negligence. Portier v. Texaco, Inc., 426 So.2d 623 (La.App.1982), writ denied 433 So.2d 165 (La.1983); Scott v. Fluor Ocean Services, Inc., 501 F.2d 983 (1974); Griffin v. LeCompte, supra, 471 So.2d 1382 at 1389 (La.1985). Contributory neghgence, however gross, does not bar recovery but only mitigates damages. Johnson v. Offshore Exp., Inc., 845 F.2d 1347, (5th Cir.1988), rehearing denied, cert. denied 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 533 (U.S.La.,1988).
Our review of the record indicates that the jury’s determination of liability and the ninety percent apportionment of fault to the plaintiff is supported by the evidence, even at the ninety percent level. Certainly the plaintiff presented evidence indicating that the lead tongs were hung in such a way as to cause them to have a certain degree of “swing” when released. However, the jury was not required to *1251 accept the plaintiffs | ^contention that this swing was sufficiently extreme or unusual to require a larger apportionment of fault to the defendant. Certainly, also, there was testimony indicating that a coworker, such as Thomas Macheck, might be expected to signal the lead tong operator if the tongs were swinging toward the operator’s back. This evidence is present and is accepted as part of the fault found on the part of ENSCO. However, the defendant also presented testimony indicating that, even faced with these conditions, the lead tong operator was primarily responsible for his own safety.
With regard to the amount of swing, the plaintiffs expert in the field of petroleum engineering, Calvin Charles Barnhill, explained that one of the plaintiffs theories of the accident was that the positioning of the tongs on the rig created excessive swing. However, Mr. Barnhill also stated as follows upon questioning:
Q And you didn’t make a comparison of this rig with any other rig in the ENSCO fleet, nor any type of comparison with this rig’s — the amount of swing on those tongs with any other rig in the Gulf of Mexico?
A That’s true, for purposes of this case. Now, I’ve worked on quite a few other rigs. And I have seen tongs hung in different configurations. So you know, to say that there is one place you always hang the tongs, that’s not true. It depends on the derrick and how they’re set.
Q Every derrick is going to be a little different, right?
A Correct.
Q Every tong is going to swing slightly differently?
A Yes, in my experience, they will.
Q Surely. And it’s up to a good floor hand to be able to — after a little experience, use it a little while, to be able to know exactly how much tong' — how much swing is going to be in that tong, how much force he can give it and how to handle it?
A Yes, the floor hand should make that determination.
|7Even Scotty Eaves, the crew’s driller, whose testimony was presented for the proposition that the tongs carried a great deal of excessive swing, indicated that it was ultimately the lead tong operator’s responsibility to ensure that the tongs were out of the way.[1]
Further, the jury was aware from Mr. Aycock’s own testimony, that he had been working for ENSCO for approximately six months prior to the accident and had worked on the rig prior to it being moved offshore; sufficient evidence to find that he was familiar with its operations. He also explained that, although the spinner wrench operator would generally help him “watch” his tongs, he was responsible, as lead tong operator to “push them out of the way.” The jury heard the following colloquy between defense counsel and the plaintiff:
Q And you don’t argue with the fact that you’re responsible for your own tongs, aren’t you?
*1252 A Well, I was helping a friend and I figured a friend would help me watch my back.
Q I understand. So you think it’s okay to violate that principle rule that we just talked about because the backups got hung up?
A We was in a hurry. And it’s just — -I was just trying to help him so we could get out [of] the way.
IsBenny Wayne Tullía, an Offshore Installation Manager for ENSCO, who described himself as the designated man in charge of the shift explained to the jury how the tongs were hung aboard the rig. He explained that if the lead tongs were not involved in an operation, they needed to be out of the way. He explained that they could be hooked to a post or released in a neutral position. This latter option, however, required that the operator watch them to ensure that there was no more swing. He explained that, after this point, the operator could safely turn his back on the tongs and they would not swing toward him.
ENSCO also presented testimony from Mr. Aycock’s coworkers, who each testified regarding the lead tong operator’s ultimate responsibility for the tongs. Michael Barnes explained that he was working as a shaker hand aboard Rig 60 in September 1997, and that he had operated both the lead and the backup tongs aboard the rig. He explained that every set of tongs he had seen had been hung the same way. Mr. Barnes stated that, to operate the tongs, “you want to have some play.” He affirmed that this “play” enabled the operator to walk them forward and back. Mr. Barnes also explained that if the operator unlatches the tongs and lets go of them, “[tjhey’re kind of just going to drift back until they get to a certain point and they’ll drift back to you.” He confirmed that they will eventually come to rest in the same place where they are hung. Mr. Barnes also explained that the tongs could be tied, so that they did not move. He testified as to the procedure when the rear tongs become jammed, as they did in this instance. He explained:
Q If it’s the backup tongs that are hanging, the lead tong operator can unlatch his tongs, get them out of the way—
A Get them out of the way.
Q —And then come help you, right?
| qA He has to make sure them tongs are not swinging, make sure they’re still or hang them off.
Q One or the two?
A One or the two.
Q Now, is there any particular hurry that the lead tong operator would be in if, say, the backup tongs had somehow got jammed?
A Well, it’s just — it all depends on who you’re working for, how big a hurry they’re in. Some drillers want you to hurry; some don’t. Most of the time, there ain’t nobody rushing you. You take them off and you stop them. You make sure they’re stopped or — you stick your foot out there and stop them with your foot or anything.
Q That’s the primary thing you have to do no matter how fast you’re going? A That’s right. Always pay attention.
At the time of the plaintiffs accident, Mr. Barnes was operating the backup tongs, however, he did not witness the lead tongs striking Mr. Aycock in the back. Mr. Barnes stated that, before Mr. Aycock came to assist him, “he should have turned around or stopped the tongs.” He further explained: “You never turn your back on them. Once you unlatch them, you turn your back and face them, you stop them and make sure they’re not coming back toward you.” Finally, the jury heard de *1253 fense counsel inquire: “If you get hit by your own tongs, that’s your own fault, isn’t it?” Mr. Barnes responded: “Yes, sir.”
ENSCO also presented the testimony of Quiton Wayne Gray, who explained that he was working as either an assistant driller or a roughneck in September 1997. Mr. Gray stated that he had operated the lead tongs on Rig 60. He denied having had a problem working them and denied that he had a problem with their degree of swing. He confirmed that, when working on the floor, he always made sure that he did not turn his back on the tongs. Finally, Thomas Macheck, the coworker operating the Imspinner wrench at the time of the accident, also testified regarding the accident. He explained that the incident occurred in the “blink of an eye” and that he did not have time to warn Mr. Aycock. He further testified that he had previously operated the lead tongs and that he had not had any problems with them. He explained that he had never had any problem moving them to their natural hanging position or tying them to their post.
On review, we conclude that the entirety of the evidence permitted the jury to conclude, even in light of findings of unseaworthiness and negligence, that Mr. Ay-cock bore a substantial amount of the fault for the accident. The record is such that the jury could have found ENSCO responsible for tongs that carried slightly excessive swing, not the great swing described by Mr. Eaves. The jury could also have found that there was more that the crew could have done to prevent the accident. However, the record also permits the jury to conclude that, ultimately, Mr. Aycock was responsible for the lead tongs, and that he negligently failed to secure them before turning his back or ensure that they were not swinging toward him. While the record could have supported different views, those of the jury, both with regard to a finding of fault and the apportionment, are supported by the record.[2] Finding no manifest error, we conclude that the assignment regarding plaintiffs fault, and apportionment thereof, is without merit. Similarly, the trial court did not err in denying the motion for JNOV.
| ^Damages
The plaintiff also questions the jury’s award of $33,000 for future loss of earnings. He contends that, due to physical impairment and disability, he cannot return to work earning the wages he earned as an employee of ENSCO. He points out that the physician who performed his surgery denied that he would be able to return to his heavy duty position at ENSCO. He contends that his damages far exceeded the figure awarded by the jury and that ENSCO presented no evidence refuting the testimony of his economist, Dr. Randy Rice. Dr. Rice supplied various figures based on an inability to return to work at all and being able to return to work at a minimum wage type of position. Although the plaintiff filed a motion for additur in this regard, the motion was denied. ENSCO contends there is no reversible error in the jury’s award, given *1254 the claimant’s history of positions that were significantly lower paying than his position with ENSCO, which paid approximately $33,000 per year. They contend that it was not error for the jury to have taken this into consideration.
In Culver v. Slater Boat Co., 122, F.2d 114 (5th Cir.1983), commonly referred to as Culver II, a four step analysis was set forth for use in determining future lost wages in maritime eases. The Fifth Circuit explained the process as: 1) Estimate the loss of work resulting from the accident; 2) Calculate the lost income stream; 3) Compute the total amount of damages; and 4) Discount the total amount to its present value. See also Fontenot v. Southwestern Offshore Corp., 00-1722 (La. App. 3 Cir. 6/6/01); 787 So.2d 588, writ denied, 01-1913 (La.10/12/01); 799 So.2d 504; Jenkins v. Kerr-McGee Corp., 613 So.2d 1097 (La.App. 3 Cir.), writs denied, 616 So.2d 701, 702 (La.1993).
The award for future loss of earnings made by the jury is not precise. However, it is reflective of evidence regarding Mr. Aycock’s wage earning ability. Dr. 112Watermeier, the orthopedic surgeon who performed Mr. Aycock’s back surgery, reported that by Mr. Aycock’s final visit on August 8, 2000, he was doing well and was able to do things around the house, but suffered from an occasional back or leg aching. Dr. Watermeier testified that he would expect Mr. Aycock to have progressive pain during the course of his life, but that he would not require further surgery. He explained that he had not released him from his care, but stated that he would assign a 20-25% disability due to Mr. Ay-cock’s surgery. He felt that Mr. Aycock could perform sedentary and light duty, restricted to an infrequent lifting of over fifty pounds. When asked about his ability to jump, climb, bend, and stoop, Dr. Wat-ermeier explained that he could occasionally perform these activities but not on a regular, repetitive basis. He felt that, although Mr. Aycock had not been released from his care, he could return to some form of job, within the restrictions set forth above. Dr. Watermeier testified that he would expect Mr. Aycock to reach maximum medical cure approximately two years after surgery.
The plaintiff contends that, even if released to return to some form of work, his educational limitations indicated that he would not be able to find work suited to his needs. In this regard, Dr. Rice explained that he calculated Mr. Aycock’s future loss of earnings based upon his earnings at ENSCO and calculated into the future, given various earnings. If Mr. Aycock could not return to work in any capacity, loss of earnings could have exceeded $375,000. If he were to return to work making minimum wage, Dr. Rice calculated his loss of earnings to be in excess of $245,000. These figures assumed that Mr. Aycock would continue to earn the salary he made while working for ENSCO, a position he held for approximately six months prior to the accident. He did not take into account previous tax returns reflecting previous jobs and lesser annual salaries.
|13ENSCO presented the testimony of Jennifer Palmer, a vocational rehabilitation counselor. She reviewed Mr. Aycock’s work history and medical reports, in order to evaluate positions for which he might be suited. She identified fourteen or fifteen employers in his past, noting that this type of work history identifies Mr. Aycock as someone who is able to find a job. She also felt that this history ruled out any findings of functional illiteracy, as contended by the plaintiff, as he would not have been able to perform in his previous jobs were that the case. She felt that Mr. Aycock would be most successful in re *1255 turning to a position he held in his past. She identified the positions of short haul truck driving and long haul truck driving. She noted that Mr. Aycock testified that, when he was employed as a truck driver, he earned approximately twenty-five to thirty thousand dollars a year. Ms. Palmer affirmed that she believed these positions were within the restrictions set forth by Dr. Watermeier. She also felt that related positions, such as van driver, school bus driver, and forklift operator would also be appropriate, but not as high paying as truck driving. She also noted that federal and state programs were available if Mr. Aycock attempted to further his education.
Our review of the parties’ evidence reveals support for the jury’s decision that Dr. Rice’s calculations assuming Mr. Ay-cock’s earning capability as that at the time he was employed by ENSCO was not accurate of his “income stream” in general. This is true due to Mr. Aycock’s varied work history and his limited time on the ENSCO job, approximately six months. We do not find error in the jury’s consideration of this type of fact. See Fontenot, 00-1722; 787 So.2d 588 (wherein a panel of this court affirmed an award for future lost earnings based on an average wage rate when the plaintiffs oilfield salary reflected fluctuations in the oilfield employment market for the five years prior to injury). Neither do we find error in any [ ^consideration given to the testimony of ENSCO’s vocational rehabilitation counsel- or regarding her opinion that the plaintiff could return to work as a truck driver and do so within the restrictions set forth by Dr. Watermeier. Also, the jury heard from the plaintiff that his salary during the years he worked off and on as a truck driver was very near equivalent to that he earned in the oilfield. Finally, as the jury was aware of Dr. Watermeier’s testimony indicating that the plaintiff had not yet reached maximum medical cure, the figure awarded by the jury does not necessarily have to be viewed as a finding of future loss of earnings in perpetuity. Rather, the figure awarded is roughly equivalent to one year’s wages at ENSCO. The jury was free to conclude that this figure would compensate the plaintiff while he continued toward maximum medical cure and after that time, Mr. Aycock could return to work as a truck driver making roughly equivalent to wages earned in the oilfield.
Given the various scenarios supported by evidence or permissible inferences, we find no error in the award requiring reversal. We also find no error in the trial court’s denial of the additur.
DECREE
For the foregoing reasons, the judgment of the trial court is affirmed. All costs of this appeal are assigned to the plaintiff, Carl Aycock.
AFFIRMED.
SAUNDERS, J., concurs and assigns written reasons.
WOODARD, J., dissents regarding the affirmation of the $38,000 award for loss of future earnings and agrees with the opinion in all other respects.

. The following colloquy is contained in the record:
Q Now, isn't it the job responsibility of a tong operator to make sure before he turns his back on those tongs they are safely out of the way?
A That’s correct.
Q And in fact, Mr. Aycock was one of your better guys. He normally made sure that they were out of the way?
A Normally, he did. Now, I—
Q Why he didn't on this occasion, you have no answer?
A I have no answer on that.

. We note that the plaintiff directs this court to two cases in which the plaintiff seaman was apportioned a far lesser percentage of fault. See Parker v. Delta Well Surveyors, Inc., 00-1121 (La.App. 4 Cir. 5/2/01); 791 So.2d 717; Domonter v. C.F. Bean Corp., 99-1204 (La.App. 5 Cir. 4/25/00); 761 So.2d 629, writ denied, 00-1872 (La.9/29/00); 770 So.2d 354. He contends that the allocation of fault related to his conduct is manifestly erroneous when compared to that of the plaintiffs in the above two cases. While we have carefully considered the plaintiff's argument in light of these case, we observe that the lesser percentages apportioned to the seamen in Parker and Domonter were fixed by the juries in those cases. Both were affirmed on appeal.