## STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 05-755
## consolidated with 05-756


**WANDA BAKER SMITH, ET AL.**

**VERSUS**

**THE MUNICIPALITY OF FERRIDAY, ET AL.**


************

APPEAL FROM THE
SEVENTH JUDICIAL DISTRICT COURT,
PARISH OF CONCORDIA, NOS. 36263 and 36348,
HONORABLE LEO BOOTHE, DISTRICT JUDGE

************

**MICHAEL G. SULLIVAN**
**JUDGE**

************

Court composed of Marc T. Amy, Michael G. Sullivan, and Billy Howard Ezell, Judges.


**REVERSED IN PART; AFFIRMED IN PART;**
**AMENDED IN PART; AND RENDERED.**


**Antonio Marcell Clayton**
**Dennis Coleman Weber**
**Attorneys at Law**
**607 N. Alexander Avenue**
**Port Allen, Louisiana 70767**
**(225) 344-7000**
**Counsel for Plaintiff/Appellee:**
    **Wanda Baker Smith**

**Neil D. Sweeney**
**Sweeney & Miller**
**7921 Picardy Avenue**
**Baton Rouge, Louisiana  70809**
**(225) 768-7300**
**Counsel for Plaintiffs/Appellants/Appellees:**
    **Allen Whitehead**
    **Paula Whitehead Brazil**
    **James Whitehead**
    **Brenda Whitehead**
    **Eddie Whitehead**

**Stacy Christopher Auzenne**
**Auzenne Law Firm, L.L.C.**
**Post Office Box 11817**
**Alexandria, Louisiana  71315-1817**
**(318) 880-0087**
**Counsel for Defendants/Appellants:**
    **Terrance A. Williams**
    **Town of Ferriday**

**Randall Brian Keiser**
**Keiser Law Firm, L.L.C.**
**Post Office Box 12358**
**Alexandria, Louisiana  71315-2394**
**(318) 443-6168**
**Counsel for Defendants/Appellants:**
    **Terrance A. Williams**
    **Town of Ferriday**

**Lisa Coleman Lee**
**Attorney for Department of Health & Hospitals**
**1201 Capitol Access Road**
**Baton Rouge, Louisiana  70821**
**(225) 342-0207**
**Counsel for Intervenor:**
    **State of Louisiana, Department of Health & Hospitals**

SULLIVAN, Judge.

The Municipality of Ferriday and Ferriday Police Officer Terrence Williams appeal a judgment awarding damages to Wanda Baker Smith and the children of Harold Whitehead as a result of a collision between vehicles driven by Officer Williams and Mr. Whitehead. For the following reasons, we reverse in part, affirm in part, amend in part, and affirm as amended.

### *Facts*

The collision between Mr. Whitehead's vehicle and the vehicle driven by Officer Williams occurred at approximately 3:00 a.m. on July 6, 1999. Officer Williams was pursuing Ricky Hollins, a fellow Ferriday police officer who was allegedly speeding south on U.S. Highway 65 in Ferriday, when he collided with Mr. Whitehead's Cadillac. Mr. Whitehead was traveling north on U.S. Highway 65 and was turning left off of the highway when Officer Williams hit him. Officer Williams testified that he was speeding and did not have his siren or bar lights activated when the accident occurred. The speed limit on U.S. Highway 65 where the accident occurred is 25 m.p.h. Officer Williams testified that he was traveling between 55 m.p.h. and 65 m.p.h. and admitted that he could have been traveling faster as he approached Mr. Whitehead.

Due to questions which arose regarding Officer Williams' veracity and the validity of his actions prior to and after the accident, the Louisiana State Police (LSP) commenced an investigation to determine whether Officer Williams' actions were criminal. Officer Williams gave a statement to LSP in which he stated that he had received numerous complaints about Officer Hollins speeding in Ferriday before the accident. He admitted that, if he had caught Officer Hollins, he would have "jack[ed] him up" but not given him a ticket.

Mr. Whitehead died as a result of the accident, and Ms. Smith suffered severe injuries. Ms. Smith filed suit against Officer Williams and Ferriday to recover damages for her injuries. Mr. Whitehead's children filed a survival and a wrongful death action. The two suits were consolidated and tried March 22 through March 23, 2004.

The trial court found Officer Williams and Mr. Whitehead each 50% at fault for the accident and awarded damages to Ms. Smith for her injuries and to Mr. Whitehead's children for his wrongful death but denied their survival action claim. Defendants appealed, and Mr. Whitehead's children answered the appeal. Ms. Smith did not appeal or answer Defendants' appeal.

### *Issues*

Pursuant to the errors assigned by Defendants and the Whiteheads, we will address the following issues:

1) The assessment of fault;

2) The solidary liability of Ferriday and Officer Williams;

3) Ms. Smith's award for past and future medical expenses;

4) Ms. Smith's award for general damages;

5) Mr. Whitehead's children's awards of wrongful death damages;

6) The trial court's refusal to award survival damages;

7) The trial court's failure to award compensation for funeral expenses; and

8) The trial court's refusal to admit polygraph examination results.

### Discussion

***Assessment of Fault***

Defendants and Mr. Whitehead's children assign the trial court's assessment of fault as error; each contends the other driver is 100% at fault for the accident. The trial court assessed fault for the following reasons:

> The Plaintiffs maintained that although Harold Whitehead has liability in causing the accident, Officer Williams['] act of speeding at a rate between 60 mph and 85 mph down a Highway with a posted speed limit of 25 mph without either bar lights or siren on, and doing so while not in pursuit of an actual or suspected violator of the law, contributed to the cause of this accident. The Plaintiffs calculate liability as being 50% on the Defendants and 50% on the Plaintiffs.
>
> This Court finds that the Plaintiff[s] have well supported their claim for contributory negligence, and finds that Officer Williams is 50% at fault for the cause of the accident, and Mr. Whitehead is 50% at fault for the cause of the accident.

The trial court's discussion elsewhere in its Reasons for Judgment conflicts with this conclusion:

> This Court finds that the scene of the accident had been well lit on the night of the accident, and Mr. Whitehead saw the police cruiser approaching. This Court finds, however, that Officer Williams was traveling at so great a speed that Mr. Whitehead miscalculated the amount of time he had to turn . . . and as a result, the two cars collided.

Mr. Whitehead's children contend the trial court's assessment was erroneously made pursuant to statements made by Ms. Smith in her post-trial brief. The post-trial briefs are not in the record for us to determine who actually took this position. The record does not contain a judicial confession by Mr. Whitehead's children that Mr. Whitehead was at fault in causing the accident.

Defendants contend that Mr. Whitehead is solely at fault because he turned left in front of Officer Williams. The Whiteheads acknowledge that Mr. Whitehead had a high duty of care to insure that he could turn left safely. They argue that Officer

Williams' failure to activate his siren and emergency lights made it impossible for Mr. Whitehead to realize that Officer Williams was exceeding the speed limit by at least 30 m.p.h. Therefore, they urge it was reasonable for Mr. Whitehead to assume that Officer Williams was driving the posted speed limit of 25 m.p.h. The Whiteheads further contend that the accident would not have occurred if Officer Williams had been driving 25 m.p.h. They conclude that Mr. Whitehead's left turn in front of Officer Williams was not negligent, and he should not be assessed with any fault.

In personal injury actions, the trier of fact must determine "the degree or percentage of fault of all persons causing or contributing to the injury." La.Civ.Code art. 2323. The trier of fact's allocation of fault is entitled to great deference and should be affirmed, unless it is manifestly erroneous or clearly wrong. *Gregor v. Argenot Great Cent. Ins. Co.,* 02-1138 (La. 5/20/03), 851 So.2d 959.

In allocating fault, the trier of fact must consider the nature of the conduct of all parties and the extent of the causal relationship between the conduct and the damages claimed when allocating fault. *Watson v. State Farm Fire & Cas. Ins. Co.*, 469 So.2d 967 (La.1985). Various factors may affect the degree of fault assigned:

> (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought.

*Id.* at 974.

Officer Williams was on duty when the accident occurred. Louisiana Revised Statutes 32:24 grants drivers of authorized emergency vehicles certain privileges when they are responding to emergencies, if certain conditions are met. Section 24 (emphasis added) provides in pertinent part:

4

A. The driver of an authorized emergency vehicle, when responding to an emergency call, or when in the pursuit of an actual or suspected violator of the law, or when responding to, but not upon returning from, a fire alarm, may exercise the privileges set forth in this Section, but subject to the conditions herein stated.

B. The driver of an authorized emergency vehicle may:

. . . .

(3) Exceed the maximum speed limits so long as he does not endanger life or property;

. . . .

C. The exceptions herein granted to an authorized emergency vehicle shall apply **only when such vehicle is making use of audible or visual signals sufficient to warn motorists of their approach**, except that a police vehicle need not be equipped with or display a red light visible from in front of the vehicle.

D. The foregoing provisions shall not relieve the driver of an authorized vehicle from the duty to drive with due regard for the safety of all persons, nor shall such provisions protect the driver from the consequences of his reckless disregard for the safety of others.

In *Lenard v. Dilley*, 01-1522, p. 6 (La. 1/15/02), 805 So.2d 175, 180, the supreme court held that an emergency vehicle driver can only be held liable for actions which constitute "reckless disregard for the safety of others," i.e., "gross negligence," if the requirements of subsections A, B, and C of the statute are met. If all three of these requirements are not met, an emergency vehicle driver is gauged by an ordinary standard of "due care." *Id.*

Officer Williams testified that he did not have his emergency lights or siren activated and that he was speeding at 55 m.p.h. to 65 m.p.h. as he pursued Officer Hollins. Therefore, the trial court correctly determined that the exceptions provided in La.R.S. 32:24 are inapplicable in this matter, and Officer Williams' actions are judged by the due care standard.

Officer Williams also testified that he had received complaints concerning Officer Hollins speeding in Ferriday before July 6, 1999. Yet, he had never taken the opportunity to talk to Officer Hollins about these complaints. He testified at trial that he would have "possibly" given Officer Hollins a ticket if had caught him; however, in his statement to LSP, he admitted that he would not have issued Officer Hollins a ticket but would have merely "jack[ed] him up." The trial court concluded that Officer Williams was "simply in pursuit of a friend and not in pursuit of an actual or suspected violator of the law." This conclusion is clearly supported by the evidence.

All motorists on Louisiana highways are obligated to obey the traffic laws and must drive with due regard for the traffic on the highway. A motorist making a left turn at an intersection must "yield the right of way to all vehicles approaching from the opposite direction which are within the intersection or so close thereto as to constitute an immediate hazard." La.R.S. 32:122. Motorists have an affirmative duty not to drive faster than is reasonable and prudent under the conditions and potential hazards existing at the time. La.R.S. 32:64(A); *Lennard v. State Farm Mut. Auto. Ins. Co.*, 26,396 (La.App. 2 Cir. 1/25/95), 649 So.2d 1114.

Application of the *Watson* factors to the facts of this case reveals that the trial court's allocation of fault is clearly wrong: 1) This accident did not result from inadvertence. Officer Williams was aware that he was speeding more than twice the posted speed limit and that without his siren and bar lights activated Mr. Whitehead could not determine that he was speeding; 2) This accident is evidence that Officer Williams' conduct created great danger. Mr. Whitehead had the duty to insure that he could safely turn left from Highway 65; however, his ability to correctly assess the approach of Officer Williams' vehicle was grossly impaired by Officer Williams' excessive speed and failure to use his bar lights and/or siren; 3) There is little

6

significance in Mr. Whitehead's conduct of turning left, as it was for the purpose of visiting a friend, and the same is true of Officer Williams' conduct. Defendants contend Officer Williams was pursuing a speeder, and his conduct was necessary for the safety of Ferriday's citizens. However, as the trial court observed, Officer Williams was not in the role of police officer at the time he was chasing Officer Hollins because he was "in pursuit of a friend and not in pursuit of an actual or suspected violator of the law"; 4) Officer Williams was clearly in the superior position to realize the seriousness of his actions, as he admitted Mr. Whitehead could not determine his speed as he approached; 5) There were no extenuating circumstances.

Defendants complain that the trial court accepted Plaintiffs' expert's opinion over their expert's opinion regarding the speed Officer Williams was traveling when he struck Mr. Whitehead's Cadillac. We need not address the differences of the experts' opinions. Officer Williams' speed was addressed by Defendants' experts in the context of an officer in legitimate pursuit of a speeder. We affirmed the trial court's finding that Officer Williams was "simply in pursuit of a friend" when he hit Mr. Whitehead. Thus, he was not in legitimate pursuit of a speeder, and the testimony is unnecessary to the determination of this case. This is especially true in light of Officer Williams' admissions that he was speeding at 55 m.p.h. to 65 m.p.h. and that Mr. Whitehead could not discern his speed as he approached. We further observe that credibility determinations, including the evaluation and resolution of conflicts in expert testimony, are factual issues to be resolved by the trier of fact. *Lasyone v. Kan. City S. R.R.*, 00-2628 (La. 4/3/01), 786 So.2d 682. We do, however, note that both experts testified this accident would not have occurred if Officer Williams had been traveling the posted speed of 25 m.p.h.

For these reasons, the trial court's assessment of fault is reversed, and Defendants are assessed 100% fault.

### Solidary Liability

The trial court awarded judgment in favor of Plaintiffs against Officer Williams and Ferriday without designating their liability as joint or solidary liability. The Whiteheads contend Defendants' liability is solidary and should be so designated in the judgment. As a matter of law, an employer and an employee are solidarily liable for damages caused by the employee's negligence. *OMSI v. Elliott*, 03-1178 (La.App. 3 Cir. 3/3/04), 869 So.2d 300. Accordingly, we amend the judgment to provide that Officer Williams and Ferriday are liable *in solido* to the Whiteheads.

### General Damages

Defendants contend the trial court's general damage award of $600,000.00 for Ms. Smith's personal injuries and pain and suffering is too high.

General damages are those which may not be fixed with exactitude. They involve mental and physical pain and suffering, inconvenience, loss of intellectual gratification and physical enjoyment, or other losses of life or lifestyle which cannot be definitely measured in monetary terms. *Simon v. Reel*, 03-932 (La.App. 3 Cir. 3/3/04), 867 So.2d 174. The severity and duration of one's injuries are factors in the assessment of damages for pain and suffering. *Id.*

Ms. Smith suffered extensive, life-threatening injuries in the accident. When she arrived at the emergency room, she was semicomatose, very short of breath, and had no blood pressure. It was determined that she had a hemopneumothorax, blood and air accumulation on the surface of the lung, that was contributing to her breathing problems. She also had an excessive amount of bleeding and multiple fractures of her lower extremities. Dr. Ronnie Gregg, the general surgeon who treated Ms. Smith for her injuries, testified that before he performed surgery on her he did not think she

would survive. Initially, Dr. Gregg surgically repaired multiple lung perforations, a ruptured diaphragm, a ruptured pericardium, and multiple liver lacerations. Later, it was determined that Ms. Smith also suffered a comminuted fracture of the right tibia and fibula and a comminuted fracture of the left femur and tibia, which also required surgery. An additional surgery had to be performed to stabilize the fractured femur. Ms. Smith also suffered a fractured pelvis, a nearly amputated ear, a fractured right ulna, and multiple facial lacerations. Ultimately, Dr. Gregg performed fifteen surgical procedures on Ms. Smith. She was hospitalized for sixty-seven days. During that time, she was on a ventilator for thirty days because her blood pressure could not be maintained and her heart, which was failing, could not be stabilized.

Dr. Gregg testified that Ms. Smith also suffered with depression during her recovery and had numerous infections which are common to patients isolated in intensive care units for long periods of time.

Ms. Smith's recovery was slow, and she continues to suffer with pain as a result of her injuries. When released from the hospital, Ms. Smith had nightmares and had problems balancing. Due to the broken pelvis, she had bladder control problems. Due to the injuries to her lungs, she has pulmonary fibrosis, which is a difficulty with gas exchange and respiration in her lungs, and she continues to have breathing problems. Dr. Gregg testified that the condition is believed to be irreversible.

When asked to describe how the accident affected her, Ms. Smith stated:

> [M]y body's not the way it was and it never will be . . . my pelvis was broke all up and my legs were broke up and it just bothers me a lot because I'm not the person I used to be as far as body wise. My body wasn't perfect, but it was better than what it is now . . . It changed my life . . . That's why if there is something I feel I can do, I push myself. You know, keep pushing, I don't want to sit down and do nothing.

Ms. Smith suffered extensive, life-changing injuries. She underwent numerous surgical procedures, and her recovery was slow and painful. She has residual

problems and Dr. Gregg expects her to develop traumatic arthritis and premature mobility problems as a result of the severe injuries to her legs. He also testified that her lung condition may worsen.

Our review of a general damage award is guided by *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257 (La.1993), *cert. denied*, 510 U.S. 1114, 114 S.Ct. 1059 (1994), where the supreme court noted that the trier of fact has "vast" discretion in awarding damages, such that an appellate court should rarely disturb a general damage award. Under *Youn* and its progeny, "[t]he initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the 'much discretion' of the trier of fact." *Id*. at 1260. We find no abuse in the trial court's general damage award.

***Medical Expenses***

The trial court awarded Ms. Smith $192,000.00 for past and future medical bills, itemizing $44,000.00 for past medical expenses and $148,000.00 for future medical expenses. Defendants urge that the award is error.

The parties stipulated that the Department of Health and Hospitals paid $45,736.24 of Ms. Smith's past medical expenses and that the remainder of her past medical expenses were written off by her medical providers. Thus, Ms. Smith is only entitled to collect $45,736.24 for past medical expenses. The trial court's award of $44,000.00 is less than the amount actually paid on her behalf for past medical expenses; however, Ms. Smith is not entitled to an increase in the award for past medical expenses because she did not answer Defendants' appeal nor did she file her own appeal. La.Code Civ.P. art. 2133; *Matthews v. Consol. Cos., Inc.*, 95-1925 (La. 12/8/95), 664 So.2d 1191.

Ms. Smith presented the testimony of Dr. Gregg to prove her claim for future medical expenses. Dr. Gregg testified that he thought Ms. Smith would likely require future medical treatment. However, he also testified that he could not testify with any certainty or medical probability that Ms. Smith would require any specific medical treatment or the cost of such treatment. Ms. Smith's attorney questioned Dr. Gregg regarding future medical treatment for Ms. Smith's lungs and legs. While Dr. Gregg testified that he would refer Ms. Smith to a specialist for her lung condition, he did testify that he expects Ms. Smith will need inhalants for her lungs. Dr. Gregg estimated an annual cost of such medications; however, there is no evidence establishing the life expectancy of Ms. Smith, which would allow such an award. Counsel coaxed Dr. Gregg into estimating the cost of a lung transplant in light of his testimony that he expected Ms. Smith to have pulmonary fibrosis for the rest of her life. However, Dr. Gregg explained that the pulmonary fibrosis may not be sufficient to cause symptoms. Ultimately, Dr. Gregg testified that he expected Ms. Smith to have problems in the future, "but how much one can't say." He testified that she may eventually need a lung transplant or she may have minimal problems and minimal expenses.

Counsel also addressed the likelihood of Ms. Smith requiring knee replacements. Dr. Gregg estimated the cost for a single knee replacement to be $40,000.00 to $50,000.00. However, on cross-examination, Dr. Gregg admitted that the likelihood of Ms. Smith requiring knee replacements was speculative at that time.

Future medical expenses are a component of special damages and must be proven by a preponderance of the evidence. *Basco v. Liberty Mut. Ins. Co.*, 05-143 (La.App. 3 Cir. 8/17/05), 909 So.2d 660. To recover future medical expenses, the plaintiff must present medical testimony to show that it is more probable than not that

11

future medical treatment is indicated and the probable cost of the treatment. *Id.* Dr. Gregg's testimony does not satisfy these requirements; therefore, the trial court's award of future medical expenses is reversed.

***Wrongful Death Damages***

Mr. Whitehead's children were awarded $10,000.00 each for the wrongful death of their father. The trial court made this award on the basis that their relationships with their father were estranged. The Whiteheads contend that an award of $10,000.00 each is too low. They seek awards of $50,000.00 each. Defendants contend the trial court erred in awarding wrongful death damages, urging that Mr. Whitehead's children did not present any evidence of a close relationship with their father.

> Elements of damage for wrongful death are loss of love and affection, loss of services, loss of support, medical expenses and funeral expenses. Damages for wrongful death are intended to compensate the victim's beneficiaries for their compensable injuries following the victim's moment of death.

*Mathieu v. State, Dep't of Transp. and Dev.,* 598 So.2d 676, 681 (La.App. 3 Cir.), *writ denied*, 600 So.2d 665 (La.1992).

Review of the record reveals that Mr. Whitehead was married twice and had children during each marriage. He had three children during his first marriage: Brenda, Eddie, and Ricky, and two children during his second marriage: Allen and Kathy. The first marriage ended in a bitter divorce. Mr. Whitehead's first wife did not allow him to visit his children, and for many years his attempts to visit were quashed. However, as the children grew older, Mr. Whitehead devised plans to see them and eventually, he was able to reestablish a relationship with them. Brenda was approximately forty-six years old when her father died. She had lived with her father and his second wife for a period of time as a young adult and continued her

relationship with her father into adulthood and described their relationship as good. She testified about having her father to her home for holidays. Brenda also testified that after Mr. Whitehead's death she experienced some problems with depression.

Ricky was four years old when his parents divorced. His father reestablished their relationship when Ricky was eleven or twelve years old. At that time, Ricky was living with his grandparents and saw his father almost nightly. They enjoyed playing board games, like canasta, chess, and checkers. He testified that he continued to see his father regularly and that they had a good relationship. Eddie was two years old when his parents divorced. He and his father were able to begin seeing each other again when he was in the seventh grade. Eddie also testified that he saw his father quite often during his last years and that he and his father played chess, dominoes, and cards together.

Brenda, Ricky, and Eddie's relationship with their father may not have been as strong and close as some adult children's relationships with their parents. However, they were certainly not "estranged" from their father when he died. The evidence establishes that Mr. Whitehead and these children developed the close relationships their mother denied them when they were young. They may not have seen their father daily, weekly, or even monthly, but they were in regular contact with him and visited him.

Allen and Kathy were luckier than Brenda, Eddie, and Ricky, as they grew up with their father. Mr. Whitehead worked in Singapore for a period of time, and Allen and Kathy testified to the trips they took together during those years. Their testimony also established that their relationship with their father was good and continued until his death.

We find the trial court's awards of $10,000.00 per child abusively low and increase their awards to $25,000.00 each.

Mr. Whitehead's children also assign as error the trial court's failure to award them Mr. Whitehead's funeral expenses. Funeral expenses are one element of a wrongful death claim as are loss of love and affection, loss of services, and loss of support. There is no requirement that funeral expenses be awarded in addition to wrongful death damages. We find no error with the trial court's failure to make a separate award for funeral expenses.

### Survival Damages

Mr. Whitehead's children assign as error the trial court's failure to award survival damages. They contend the evidence establishes that he suffered pain before he died as a result of his injuries. Survival damages "for pain and suffering are properly awarded if there is a scintilla of evidence of any pre-death pain or suffering by the victim." *Id.* There is no evidence that Mr. Whitehead suffered pain before his death. The testimony of the emergency medical technicians who treated Mr. Whitehead at the accident scene is that he was alive when they arrived at the scene; however, he was unconscious: he did not move or attempt to communicate with them. The only evidence of consciousness is that he wobbled his head when asked whether he could open his car door. There is no testimony that he was in a state of consciousness such that he was aware of any pain caused by his injuries. Accordingly, we find no error with the trial court's denial of survival damages.

### Polygraph Examination Results

Defendants' last assignment of error is the trial court's refusal to admit the results of a polygraph examination of Officer Williams by LSP. In *Evans v. DeRidder Municipal Fire and Police Civil Service Board*, 01-2466 (La. 4/3/02), 815 So.2d 61, *cert. denied*, 537 U.S. 1108, 123 S.Ct. 884 (2003), the supreme court held that

14

polygraph examination results are admissible in an appeal of a Civil Service Board ruling in a Civil Service employee disciplinary proceeding. The court stated in a footnote that it was not ruling on whether such results are admissible in a civil proceeding. For the following reasons, we do not address this issue.

Defendants identify four issues which were addressed in the polygraph examination: 1) whether Officer Williams' headlights were on as he drove toward Mr. Whitehead; 2) whether the light bulb filament wires of the headlights on Officer Williams' police unit had been clipped after the accident; 3) whether Officer Williams went to his police unit at the wrecker yard; and 4) whether Officer Williams recognized Officer Hollins as he pursued him.

The trial court concluded that Officer Williams had his headlights on as he pursued Officer Hollins. Items 1, 2, and 3 above are all pertinent to that issue. Because this issue was resolved in Defendants' favor, any error in the trial court's refusal to admit the polygraph examination results into evidence was harmless in this regard. *See Richardson v. State,* 98-918 (La.App. 3 Cir. 12/9/98), 726 So.2d 417, *writ denied,* 99-483 (La. 4/1/99), 742 So.2d 561.

Officer Williams testified at trial that he lied to LSP about the description of the car he was pursuing and the identity of the driver. He admitted that he "did not tell [LSP] that [he] knew it was Ricky Hollins" because Officer Hollins is a fellow officer. Officer Williams also testified that he lied in his deposition when he stated he did not know who he was chasing until Trooper Sandifer told him it was Officer Hollins. In light of this testimony, the polygraph examination results regarding Officer Williams' recognition of Officer Hollins as the speeder he was chasing were immaterial. This assignment is without merit.

***Disposition***

The trial court's assessment of fault is reversed and fault is assessed 100% to Defendants; the judgment is amended to provide that Defendants are solidarily liable to the Whiteheads; the general damage award of $600,000.00 to Ms. Smith is affirmed; the award of future medical expenses in favor of Ms. Smith is reversed; the wrongful death damages in favor of Mr. Whitehead's children are amended to $25,000.00 per child; the failure to make a separate award for funeral expenses is affirmed and the refusals to award survival damages and to admit polygraph examination results are affirmed. All costs are assessed to Defendants.

**REVERSED IN PART; AFFIRMED IN PART; AMENDED IN PART; AND RENDERED.**