# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## 18-206

RILEY LEBLANC

VERSUS

CITY OF ABBEVILLE

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF VERMILION, NO. 102352
HONORABLE EDWARD B. BROUSSARD, DISTRICT JUDGE

**********

## VAN H. KYZAR
## JUDGE

**********

Court composed of Marc T. Amy, John E. Conery, and Van H. Kyzar, Judges.

**AFFIRMED**

Joy C. Rabalais
Allison M. Ackal
BORNE, WILKES & RABALAIS, LLC
P. O. Box 4305
Lafayette, LA 70502-4305
(337) 232-1604
COUNSEL FOR DEFENDANT/APPELLANT:
    City of Abbeville

Bernard F. Duhon
P. O. Box 1169
Abbeville, LA 70511-1169
(337) 893-5066
COUNSEL FOR PLAINTIFF/APPELLEE:
    Riley LeBlanc

G. Andrew Veazey
Bradford H. Felder
Dona K. Renegar
VEAZEY, FELDER & RENEGAR
P. O. Box 80948
Lafayette, LA 70598-0948
(337) 234-5350
COUNSEL FOR PLAINTIFF/APPELLEE:
    Riley LeBlanc

**KYZAR, Judge.**

Defendant/Appellant, the City of Abbeville ("the City"), appeals a trial court judgment rendered in favor of Plaintiff/Appellee, Riley LeBlanc, after Mr. LeBlanc was injured while stepping on a storm grate in the custody and control of the City. After a full trial on the merits, the trial court awarded Mr. LeBlanc the following: past medical expenses in the amount of $35,846.38; future medical expenses in the amount of $100,532.50; past lost earnings in the amount of $59,348.00; future loss of earning capacity in the amount of $524,595.00; and past and future general damages in the amount of $250,000.00 for a total award of $970,321.88. For the following reasons, we affirm the judgment of the trial court.

## FACTS AND PROCEDURAL HISTORY

On April 1, 2016, Riley LeBlanc was standing outside of his neighbor's home at 203 Gauraud Street in Abbeville, Louisiana, speaking to his neighbor, Reed Hebert. The two men were in front of Mr. Hebert's house, Mr. Hebert inside his fenced yard and Mr. LeBlanc on the outside. During their conversation, Mr. Hebert's daughter, who had been playing in the yard, fell into a rose bush and cried out for help. Both gentlemen immediately stepped toward the sound in an effort to reach and assist the child. In his haste, Mr. LeBlanc stepped on a metal storm grate that was partially covered with grass. The grate sits above a catch basin. When Mr. LeBlanc stepped on the metal grate, it purportedly broke at two separate corners, causing Mr. LeBlanc's right leg to fall through the opening. This caused Mr. LeBlanc to suffer a severe laceration to his lower leg. Due to this injury, Mr. LeBlanc is unable to continue his work as a carpenter and purportedly has ongoing pain and issues with his lower extremity.

On September 21, 2016, Mr. LeBlanc filed a Petition for Damages, naming the City as the defendant. Mr. LeBlanc stated that the metal storm grate involved is part of a sewage servitude maintained by the City in connection with its sewage, water, and wastewater systems and that the City is authorized and conducts routine maintenance and inspections on the sewage servitude and its related parts. He asserted the storm grate in question was severely deteriorated and riddled with rust. The City denied all of Mr. LeBlanc's claims and filed a motion for summary judgment, claiming that it owed no duty to the plaintiff as the storm grate was open and obvious and also that the grate was in good condition and not unreasonably dangerous. The City's motion was heard and denied on October 23, 2017.

A trial on the merits took place on November 20, 2017 to November 21, 2017, after which the trial court rendered judgment in favor of Mr. LeBlanc with written reasons signed on December 6, 2017. The trial court found the City liable for Mr. Leblanc's injury, citing the provisions of La.Civ.Code art. 2317 and La.R.S. 9:2800. It specifically found that the compromised condition of the storm grate was not "obvious to all" and as such the City did owe a duty and, further, that the City had constructive knowledge of the grate's defect. Finally, the trial court awarded Mr. LeBlanc both general and special damages, including past medical expenses, future medical expenses, past lost earnings, and future loss of earning capacity.

The City timely appealed on January 3, 2018. On appeal, the City presents six issues for review.

    (1) Whether the trial court misapplied the law to the facts presented at trial on the issue of whether the storm grate was [an] open and obvious condition.

    (2) Whether the trial court committed legal error in finding that the City of Abbeville owed a duty of care to plaintiff to protect him from an open and obvious condition.

2

(3) Whether the trial court committed legal error in finding that the City of Abbeville had notice of any alleged defect pursuant to La.R.S. 9:2800.

(4) Whether the trial court committed legal error in failing to find that the City was immune for its discretionary acts under La.R.S. 9:2798.1.

(5) Whether the trial court committed error in failing to assess plaintiff with any fault.

(6) Whether the damages awarded by the trial court are impermissibly excessive.

## OPINION

The City asserts that the trial court committed legal error in finding that it was liable for Mr. Leblanc's injury. The City stipulated that the storm grate involved in the incident was in its custody. However, the City argues the trial court erred in ruling that the storm grate in question was not an open and obvious condition for which the City owed no duty to Mr. LeBlanc and also in ruling that the City had notice as to any alleged defect in said storm grate. Under La.Civ.Code art. 2317, "[w]e are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody." Louisiana Revised Statutes 9:2800(C), which governs the analysis of a public entity's liability for a defective thing within its custody or care, further states:

[N]o person shall have a cause of action based solely upon liability imposed under Civil Code Article 2317 against a public entity for damages caused by the condition of things within its care and custody unless the public entity had actual or constructive notice of the particular vice or defect which caused the damage prior to the occurrence, and the public entity has had a reasonable opportunity to remedy the defect and has failed to do so.

To establish a claim against a public entity for damages caused by the condition of things within its care or custody, a plaintiff must show that (1) the thing

3

that caused the damage was in the care or custody of the public entity, (2) the thing was defective due to a condition that created an unreasonable risk of harm, (3) the public entity had actual or constructive notice of the condition yet failed to take corrective action within a reasonable period of time, and (4) the defect was a cause in fact of the plaintiff's harm. La.R.S. 9:2800; La.Civ.Code art. 2317; *Ricks v. City of Shreveport*, 42,675 (La.App. 2 Cir. 10/24/07), 968 So.2d 863. Constructive notice means the existence of facts which imply actual knowledge. La.R.S. 9:2800(D). A trial court's findings under La.R.S. 9:2800, the statute governing limitations of liability for a public entity for things within its care and custody, are subject to manifest-error review. *Ricks*, 968 So.2d 863.

## Liability of the City

In its first three assignments of error, the City alleges the trial court erred in finding the City liable to Mr. LeBlanc for his injury based upon a number of the factors that a plaintiff is required to show in order to establish a claim against a public entity. *See Ricks*, 968 So.2d 863. As such, we will now address these factors.

### *(1) Care or Custody of the Storm Grate*

The City's custody of the storm grate involved in the incident is undisputed. Clay Menard, the City's Public Works Director, and Richard Sysak, the foreman for the City's Streets Department, both testified at trial. Mr. Menard acknowledged that the storm grate was in the custody of the City and that the City is responsible for the maintenance, repair, and cleaning of storm and drainage grates that are in its rights-of-way. Mr. Sysak testified that the storm grates around the City are part of the City's infrastructure and they are responsible for maintaining them. The City replaced the subject storm grate after the incident.

### *(2) Unreasonable Risk of Harm*

4

To determine whether a defect presents an unreasonable risk of harm, the supreme court has adopted a risk-utility balancing test, synthesized to a consideration of four pertinent factors: "(1) the utility of the complained-of condition; (2) the likelihood and magnitude of harm, including the obviousness and apparentness of the condition; (3) the cost of preventing the harm; and (4) the nature of the plaintiff's activities in terms of its social utility or whether it is dangerous by nature." *Broussard v. State ex rel. Office of State Bldgs.*, 12-1238, p. 10 (La. 4/5/13), 113 So.3d 175, 184.

> Because the determination of whether a defective thing presents an unreasonable risk of harm "encompasses an abundance of factual findings, which differ greatly from case to case, followed by an application of those facts to a less-than scientific standard, a reviewing court is in no better position to make the determination than the jury or trial court." [*Reed v. Wal-Mart Stores, Inc.*, 97-1174, p.4 (La. 3/4/98, 3), 708 So.2d 362, 364-365.] Accordingly, the fact-finder's unreasonable risk of harm determination is subject to the manifest error standard of review and should be afforded deference on appeal. *Id.* at 364-65. Under the manifest error standard of review, a court of appeal may not set aside a jury's finding of fact unless it is manifestly erroneous or clearly wrong. *Rosell v. ESCO*, 549 So.2d 840, 844 (La.1989). The reviewing court must only decide whether the fact-finder's conclusion was reasonable, not whether it was right or wrong. *Stobart v. State through DOTD*, 617 So.2d 880, 882 (La.1993). In order to reverse a jury's factual finding as manifestly erroneous, an appellate court must find the record, when reviewed in its entirety, (1) contains no reasonable factual basis for the jury's finding and (2) establishes the finding is clearly wrong. *Id.* The court of appeal must always be mindful that if the jury's findings "are reasonable in light of the record reviewed in its entirety ... [it] may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Id.* at 882-83; *Rosell*, 549 So.2d at 844.

*Broussard*, 113 So.3d at 185-86.

*Utility of the Thing*

There can be no doubt that storm grates like the one involved in the current incident serve a vital purpose as a part of the City's drainage system. The storm drainage system employed by the City is designed to remove water from the

roadways and provide proper drainage for neighborhoods. However, this is only the first prong in our inquiry.

*Likelihood and Magnitude of Harm: Obvious and Apparent*

It is while studying the likelihood and magnitude of the harm that the obviousness and apparentness of the complained of condition should be considered. Mr. Menard and Mr. Sysak both testified for the City that storm grates located within the City's rights-of-way, such as the one at issue here, are expected to be able to fully support the weight of a vehicle. While instances of injuries involving storm grates are rare, the involved storm grate's structural integrity was weakened to such an extent that the portion of the grate that Mr. LeBlanc stepped on broke and fell into the catch basin.

The City asserts that the trial court did not properly apply the law to the facts and evidence adduced at trial. The City suggests that the accident occurred, not because the storm grate was rusted, but because it was not seated properly over the catch basin. According to the City's version of events, the improperly seated storm grate flipped up when stepped on by Mr. LeBlanc, allowing Mr. LeBlanc's leg to fall between the grate and the wall of the catch basin. This is in direct contradiction to the testimony of Mr. LeBlanc and his neighbor, Mr. Hebert, who witnessed the incident.

Both Mr. LeBlanc and Mr. Hebert testified that the storm grate broke when Mr. LeBlanc stepped on it. Photographs taken after the event by Mr. LeBlanc's father and by Mr. Menard corroborate this version of events and show the storm grate with broken pieces and jagged edges. The trial court specifically found that Mr. Menard's testimony was not credible and, further, that his assertion that the storm grate was not bent or broken was contradicted by other evidence. "[W]here there is conflict in the testimony, reasonable evaluations of credibility and

6

reasonable inferences of fact should not be disturbed upon review[.]" *Rosell v. ESCO*, 549 So.2d 840, 844 (La.1989).

> When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said.

*Id.* at 844. As there is ample evidence in the record to support the trial court's findings, we will not disturb them here.

The City also asserts the trial court erred in regard to its finding that the corroded storm grate was not an open and obvious condition such that it owed a duty to Mr. LeBlanc. Whether a dangerous or defective condition is obvious and apparent is covered under the second prong of the risk-utility balancing test utilized by the supreme court in determining if a condition presents an unreasonable risk of harm. *See Broussard*, 113 So.3d 175. Though the City concedes that the storm grate was in its custody, a property owner generally does not have a duty to protect against an open and obvious hazard. La.Civ.Code art. 2317; *Broussard*, 113 So.3d 175. "In order for a hazard to be considered open and obvious, this Court has consistently stated the hazard should be one that is open and obvious to all, *i.e.*, everyone who may potentially encounter it." *Id.* at 184. If the facts show that the supposedly defective condition should be obvious and apparent to all, the condition may not be unreasonably dangerous, and the defendant may owe no duty. *Dauzat v. Curnest Guillot Logging Inc.*, 08-528 (La. 12/2/08), 995 So.2d 1184.

On appeal, the City argues that the storm grate at issue was an open and obvious condition. To support its position, the City cites *Pitre v. Louisiana Tech University*, 95-1466 (La. 5/10/96), 673 So.2d 585, *cert. denied*, 519 U.S. 1007, 117 S.Ct. 509 (1996). In *Pitre*, 673 So.2d 585, the supreme court held that a

7

landowner/custodian does not owe a duty to persons on their land when it comes to obvious or apparent defects so long as the injured person was in the same position as that of the landowner to observe the alleged defect. The City argues that because Mr. LeBlanc knew of the location of the storm grate, he was in a better position than the City to view any defect in said grate. It urges that Mr. LeBlanc has lived across the street from the storm grate for many years and points to Mr. Leblanc's testimony stating that the weather on the day of the accident was sunny and clear and that Mr. Leblanc saw the storm grate before he stepped on it. The City asserts that based upon these facts, it owed no duty of care whatsoever to Mr. Leblanc. However, as the supreme court noted:

> [T]he key to a finding of no liability in such cases is not the plaintiff's subjective awareness of the risk, but the determination that the defendant did not act unreasonably vis-a-vis the plaintiff, or injure the plaintiff through the instrumentality of an unreasonably dangerous thing in his custody. The determination of what the plaintiff knew regarding the risk of injury is made after fault on the part of the defendant has been established[.]

*Pitre*, 673 So.2d at 591 (quoting *Murray v. Ramada Inns, Inc.*, 521 So.2d 1123, 1136 (La.1988)). "The open and obvious inquiry thus focuses on the global knowledge of everyone who encounters the defective thing or dangerous condition, not the victim's actual or potentially ascertainable knowledge." *Broussard*, 113 So.3d at 188. Further, it is the *defect* or *dangerous condition* of the thing that must be open and obvious, not merely the thing itself. *See id.*

Accordingly, Mr. LeBlanc's knowledge of the existence of the storm grate is not enough to make it "open and obvious" such that the City owes him no duty. Rather, the defective condition of the storm grate must have been obvious to all that encounter it. The trial court specifically found that the compromised condition of the storm grate was not "obvious to all." As the trial court notes in its written reasons for judgment:

8

The photographs admitted into evidence show grass growing around the outer edges of the catch basin. Mr. LeBlanc testified that he had to pry the grate up out of the grass and dirt in order to extricate his leg. Richard Sysak, who subsequently replaced the grate, testified that it was hard to remove it because grass was grown into it.

While storm grates are not inherently dangerous, the magnitude of the harm created by the defective condition of the one at issue in the current case is great. This storm grate, as testified to by the City's own employees, was expected to be able to support the full weight of a vehicle. However, as the trial court's extensive written reasons for judgment note, "this particular storm grate was so compromised by pitting rust that it was incapable of supporting the weight of an adult male." This, coupled with the fact that the grass was allowed to grow around and into the grate masking its deteriorated condition, clearly show that the likelihood of the storm grate causing harm was high.

*Cost of Preventing the Harm*

The third prong in the risk-utility balancing test requires us to balance the risk of harm presented against the cost and feasibility of repair. *Broussard*, 113 So.3d 175. Evidence at trial shows that the cost of replacing the storm grate in question would cost the City approximately $100.00. This is clearly not an unreasonable amount, especially given the injury sustained. The City argues that since it has thousands of storm grates in place as part of its drainage system, the cost to replace each one at any showing of rust would be cost prohibitive. It claims it does not have the manpower nor the financial resources to replace its storm grates at such a rate.

However, as the trial court noted, it is not necessary for all of the storm grates to be replaced as soon as they begin to exhibit signs of rust. Rather, the City had a duty to replace this particular storm grate when it became, or should have become in the exercise of reasonable care, obvious that it needed to be replaced. Mr. Sysak, who inspected the grate six months before the incident, acknowledged that this

9

particular grate had not been replaced during the thirty-three years he had been employed by the City and, further, that the City had never utilized the type of material used in this particular storm grate at any point during his tenure. It is clear from the evidence introduced at trial that the storm grate in question was severely compromised and that the cost of replacing it is between $100.00-$200.00. Thus, it appears the City failed to take the relatively inexpensive precaution of replacing its outdated grate. As such, we find the trial court did not err in holding that the cost of preventing the harm was not as great as the City's arguments would suggest.

*Nature of Plaintiff's Activities*

Finally, we must examine the nature of Mr. LeBlanc's activity, particularly in terms of its social utility and whether it was dangerous by nature. *Broussard,* 113 So.3d 175. Both Mr. LeBlanc and Mr. Hebert testified that Mr. LeBlanc moved in response to Mr. Hebert's young daughter crying out in pain. As the trial court noted, Mr. LeBlanc's action of stepping on the grate was taken in a laudable attempt to aid a child in distress. The instinct and determination to aid those in peril is highly useful to society.

The City's position is that Mr. LeBlanc's activity of stepping on the storm grate was unreasonable, stating that he was in a position to avoid his injury by merely walking around the storm grate. However, we do not find stepping on a storm grate in one of the City's rights-of-ways to be an inherently dangerous activity. Both Mr. Menard and Mr. Sysak testified that such storm grates are expected to hold the weight of a vehicle. Therefore, it follows that it should be more than capable of supporting the weight of an adult male. Is stepping on a manhole cover considered an inherently dangerous activity? Manhole covers are numerous, have great utility, are easily visible to those who encounter them, and could cause great injury if an unsuspecting person fell into one. However, people routinely step on manhole

10

covers while walking along streets every day. Are we to presume all of these people are acting unreasonably or engaging in inherently dangerous activities?

Further, given Mr. Sysak's claim that he thrice jumped up and down with his full weight to test the strength of the grate in question, it is not unreasonable for Mr. LeBlanc to have assumed the storm grate was capable of holding his weight as he rushed to assist Mr. Hebert's daughter. We find the City's argument that a reasonable person would have walked around the grate in Mr. LeBlanc's situation to be unpersuasive. The trial court found Mr. LeBlanc's actions to have high social utility, and that it was the condition of the storm grate, rather than the actions of Mr. LeBlanc that was unreasonably dangerous. The manifest error-clearly wrong standard demands great deference to the trier of facts findings. *Rosell*, 549 So.2d 840.

Accordingly, we find the trial court did not err in balancing the gravity and risk of harm created by the corroded storm grate offset against Mr. LeBlanc's actions and their social utility along with the cost and feasibility of repair. Our review of the record finds there is ample evidence to determine the storm grate in question created an unreasonable risk of harm that was not open and obvious to all and that the prevention of this harm was of relatively low cost to the City.

## *(3) Actual or Constructive Notice of the Defect or Condition*

In order to held liable for injuries caused by a thing in its care or custody, a plaintiff must show the public entity had actual or constructive notice of the condition and failed to take corrective steps. *Ricks*, 968 So.2d 863. For purposes of the statutory requirement in liability actions that a public entity must have had actual or constructive notice of the particular defect that gave rise to the injury, "[a]ctual notice is knowledge of dangerous defects or conditions by a corporate officer or employee of the public entity having a duty either to keep the property involved in

11

good repair or to report defects and dangerous conditions to the proper authorities." *Smithwick v. City of Farmerville*, 45,362, p. 3 (La.App. 2 Cir. 6/23/10), 42 So.3d 1039, 1042, *writ denied*, 10-2013 (La. 11/12/10), 49 So.3d 888. "Constructive notice shall mean the existence of facts which infer actual knowledge." La.R.S. 9:2800(D). A public entity's constructive knowledge of a defect in a thing in its custody may be shown by facts demonstrating that the defect or condition has existed for such a period of time that it would have been discovered and repaired had the entity exercised reasonable care; a public entity has constructive knowledge if it knew or should have known of the defective condition. *Greene v. Succession of Alvarado*, 15-1960 (La.App. 1 Cir. 12/27/16), 210 So.3d 321.

The City asserts it had no knowledge or notice of the defective condition of the storm grate, and, as such, it cannot be held liable for Mr. LeBlanc's injury per La.R.S. 9:2800(C). We note that a public entity has no independent duty to inspect city property, and as such, failure to do so does not impute constructive notice of defects to the entity. *See Murphy v. City of New Orleans*, 09-567 (La.App. 4 Cir. 11/12/09), 25 So.3d 956. The City claims that because no complaints or other reports of a problem were made concerning the specific storm grate, it can not be found to have had notice. We again find the City's argument unpersuasive.

Evidence introduced at trial clearly shows the City conducted maintenance on the catch basin beneath the subject storm grate on October 9, 2015. Mr. LeBlanc's accident occurred on April 1, 2016, a mere six months later. Mr. Menard, Director of Public Works for the City, testified that the City is responsible for the maintenance, repair, and cleaning of the storm and drainage grates in its rights-of-way. Furthermore, it was City policy that workers performing maintenance on infrastructure were required to inspect the part on which they were working for potentially hazardous conditions. Mr. Sysak, therefore, would have inspected the

12

subject storm grate while working on the catch basin beneath in October 2015, as he would have had to remove the storm grate and reinstall it after the catch basin repairs were made. Mr. Sysak claimed that he did perform a strength test on the subject storm grate and that he "found it was sound." However, he then stated that the test he performed was merely himself jumping up and down on the grate a few times. He admits he in no way tested whether the grate was capable of holding the weight of a vehicle, as the City's policy dictates.

Both Mr. Menard and Mr. Sysak acknowledged that the storm grate in question was not constructed of the same steel grating material utilized by the City as a cover during their ten and thirty-three year respective tenures. Further, it was not galvanized and was subject to rusting, unlike the cast-iron/rebar-type material utilized by the City as a cover because such material is less resistant to corrosion. The pictures admitted into evidence clearly show a storm grate with heavily corroded corners and a broken row. The evidence in the record clearly establishes that the subject storm grate has been in use for many years, as no storm grates made of the same material as the one at issue were installed in either Mr. Sysak's or Mr. Menard's time with the City per their own admissions. Though no evidence was introduced regarding the precise rate at which the storm grate corroded, there was also no evidence admitted suggesting or explaining an accelerated rate of deterioration in the storm grate. Even Mr. Sysak admitted in his deposition testimony that there was no material difference in the storm grate between when the work was performed in October 2015 and Mr. LeBlanc's accident in April 2016 and acknowledged that failing to replace the grate in 2015 may have been an error. Specifically, Mr. Sysak's deposition testimony stated:

Q    With respect to your previous testimony, Mr. Sysak, regarding jumping up and down on this particular grating – and I think you said

13

in October of 2015 when the project took place for the work under it –
yeah – how many times did you jump up and down on it?

A    Two or three times.

Q    Okay.  And it was rusty at that point, correct?

A    Yes, I assume it was.

Q    Now, are you telling me that looking at the photographs in
Menard Number 9, which are the photographs that [Mr. Menard]
testified that he took following this accident, are you telling me that in
the six to seven months that elapsed from the time that you jumped up
and down on that grating to the time that these photographs were taken,
that the grating deteriorated to such an extent that it could not support
the weight of someone like Mr. Leblanc?

A    Run it by me again.

Q    Okay.  You specifically recall jumping up and down on the grate?

A    Yeah, and it secured my weight at the time.  Yes.

Q    Okay.  And it's your testimony from that point on until Mr.
Leblanc's accident on April 1st of 2016 that it deteriorated to such an
extent between that time that it couldn't support this gentleman when
he ran on top of it to go retrieve a child?

. . . .

A    Yeah, I'm not saying it deteriorated anymore; it's just it held my
weight.  And it might have been a bad judgment call, but I felt it was
safe enough if I could jump up and down on it about three times.

Q    It may have been a bad judgment call to not replace it at that point?

A    Possibly.

In order to be held liable for injuries caused by a thing in its care or custody,

a plaintiff must show the public entity had actual or constructive notice of the

condition and failed to take corrective steps. *Ricks*, 968 So.2d 863.  Actual notice is

knowledge of dangerous defects or conditions by a corporate officer or employee of

the public entity having a duty either to keep the property involved in good repair or

to report defects and dangerous conditions to the proper authorities. *Smithwick*, 42

So.3d 1039.  Mr. Sysak is the foreman for the City's Streets Department.  He and

14

Mr. Menard testified that part of their duties included the maintenance of the City's drainage system, which includes storm grates. Though Mr. Sysak was more reticent at trial, it is clear he was aware of the rusted condition of the storm grate. He stated that even freshly built grates have rust, meaning the rust on the subject storm grate would have begun to form early and presumably become progressively worse over its more than thirty-three years in use.

The trial court inferred from the aforementioned facts that "significant deterioration must have been evident when the grate was removed and reinstalled six months prior to the accident." There was no evidence suggesting an accelerated rate of deterioration. Though the City claims the trial court ignored Mr. Sysak's claim that the grate's condition was substantially worse than when he first saw it post-accident compared to its condition when plaintiff's counsel requested to photograph it, we note Mr. Sysak's own deposition testimony. Where there is conflict in testimony, a reviewing court should not disturb reasonable evaluations of credibility and reasonable inferences of fact. *Rosell*, 549 So.2d 840. Accordingly, we find the trial court did not err in finding the City had notice of the defective condition of the storm grate.

### (4) Causation

The trial court found that the accident occurred in the manner described by Mr. LeBlanc and Mr. Hebert, namely that part of the storm grate broke when Mr. LeBlanc stepped on it causing his leg to fall through. Mr. Hebert also testified that he noticed blood and flesh on a broken edge of the grate; a statement corroborated by photographic evidence. While Mr. LeBlanc acknowledges that the farthest side of the storm grate flipped up and his leg scraped against the concrete wall of the catch basin, the trial court found that this alone would not account for the severe laceration suffered by Mr. LeBlanc as the City's theory suggests. As the trial court

15

stated in its extensive written reasons for judgment, "It cannot be reasonably inferred that such a severe, penetrating injury occurred by simply scraping against the side of an intact storm grate ... [t]he most likely cause was contact between [Mr. LeBlanc's] leg and the broken edge of the storm grate identified by Mr. Hebert."

As we find that the record contains ample evidence for the trial court's holding that the storm grate was an unreasonably dangerous condition, we further find the trial court did not err in finding said dangerous condition to be the cause of Mr. LeBlanc's injury. Mr. LeBlanc, therefore, is entitled to recover from the City for his injury per the provisions of La.R.S. 9:2800.

## Other Arguments Advanced by Appellant

### *Discretionary Immunity per La.R.S. 9:2798.1*

Alternatively, the City argues the trial court erred in failing to find that it was immune from liability as a public entity under La.R.S. 9:2798.1. Louisiana Revised Statues 9:2798.1 states, in pertinent part, "B. Liability shall not be imposed on public entities or their officers or employees based upon the exercise or performance or the failure to exercise or perform their policymaking or discretionary acts when such acts are within the course and scope of their lawful powers and duties." The City asserts that Mr. Sysak performed an inspection in October of 2015 and did not find the grate to be broken, bent, or corroded. He then made the decision not to replace the storm grate *in his discretion*, and as such, the City is immune from liability under La.R.S. 9:2798.1.

However, the immunity offered to public entities under La.R.S. 9:2798.1 applies only to policy decisions, which are those based on social, economic, or political concerns. *Saine v. City of Scott*, 02-265 (La.App. 3 Cir. 6/12/02), 819 So.2d 496. "Operational decisions are not considered to be 'discretionary' within the meaning of La.R.S. 9:2798.1 and are not shielded from liability thereby." *Valet v.*

16

*City of Hammond*, 577 So.2d 155, 167 (La.App. 1 Cir. 1991). The decision to repair or replace a particular storm grate, and the extent of said repairs, is a decision which the City and its members, which are responsible for the upkeep and maintenance of the drainage system, must make. However, these are operational decisions, not discretionary or policy-making decisions for which La.R.S. 9:2798.1 provides immunity. *See Id.*

The policy, i.e. to maintain the storm drainage system and to maintain storm grates in the City's rights-of-way that are able to hold the weight of a vehicle, has already been made by the City. The subject employee's decisions regarding the maintenance of the storm drainage system are operational in nature, as any such decision is merely an implementation of the City's policy. *See Valet*, 577 So.2d 155. As operational decisions are not considered discretionary for the purposes of La.R.S. 9:2798.1 immunity, we find this assignment of error by the City without merit.

### *Comparative Fault*

The City next asserts the trial court erred in its assessment of fault for the incident, namely in failing to assess any fault to Mr. LeBlanc. In *Ricks*, the court also discussed the issue of comparative fault of a plaintiff in instances of injury, stating:

> Under La. C.C. art. 2323, "If a person suffers injury, death, or loss as a result partly of his own negligence and partly as a result of the fault of another person or persons, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death, or loss." Comparative fault applies to claims against public entities under La. C.C. art. 2317 and R.S. 9:2800. *Priest v. City of Bastrop*, [38,841 (La.App. 2 Cir. 7/11/01), 792 So.2d 80]. In assessing comparative fault, the courts consider (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. *Watson v. State Farm*, [469 So.2d 967 (La.1985)]. The trial court's allocation of fault is subject to manifest

17

error review. *Clement v. Frey*, 95-1119 (La.1/16/96), 666 So.2d 607; *Priest v. City of Bastrop, supra.*

*Ricks*, 968 So.2d at 869.

In the case at hand, the City argues that as Mr. LeBlanc was aware of the storm grate's existence and location, that he was in a better position than the City to be aware of the danger and could have stepped around the grate. However, it is unlikely Mr. LeBlanc stepping on the storm grate "involved an awareness of the danger," as stepping on a storm grate should not be an inherently dangerous activity as discussed above. *Id.* Similarly, an adult male stepping on a grate purportedly capable of supporting the weight of a vehicle is not a high-risk activity. The City further argues that Mr. LeBlanc was in a superior position to note the defective condition of the storm grate, given his personal knowledge of the area. However, as noted by Mr. LeBlanc, if the condition of the storm grate was not obvious to Mr. Sysak, a professional tasked with the maintenance and specific inspection of such storm grates, then it is equally unlikely to be obvious to Mr. LeBlanc, particularly given the overgrown grass surrounding the grate.

As to the significance of what was sought by the conduct, Mr. LeBlanc was attempting to assist a young child in distress. This is also pertinent to the fifth consideration regarding extenuating circumstances that might cause Mr. LeBlanc to act in haste. The City asserts that because the child was ultimately fine, that there was no need for Mr. LeBlanc to have jumped to action. However, neither Mr. LeBlanc nor Mr. Hebert was aware of the extent of the child's injuries when she cried out; they were merely startled to action to help. To place such a burden upon third persons would appear to discourage them from assisting others in need. "In any event, considerations such as 'the extent of the risk created by the [actor's] conduct' and 'extenuating circumstances which might require the actor to proceed

18

in haste' are more appropriate considerations for the fact-finder when apportioning fault among all responsible parties." *Broussard*, 113 So.3d at 193 (citing *LeBlanc v. Stevenson*, 00-157 (La. 10/17/00), 770 So.2d 766).

The trial court specifically found that "Mr. LeBlanc's action of stepping on the grate was not dangerous in nature, and it was taken in a laudable attempt to aid a child in distress." In a manifest error review, if the record reveals a reasonable factual basis for the finding of the trial court, the court of appeal may not reverse even if it would have weighed the evidence differently had it been sitting as the trier of fact. *Rosell*, 549 So.2d 840. Based upon the record before us, we cannot say the trial court abused its great discretion in apportioning fault.

## Damages

In its final assignment of error, the City asserts the trial court erred in awarding damages that are excessively high. "The primary objective . . . in fixing the award in a personal injury case is to adequately compensate the injured person for his injury under facts shown to exist in the case. The primary considerations in assessing damages are severity and duration of injured party's pain and suffering." *Thompson v. Louisiana Dep't of Transp.*, 93-1294, p. 8 (La.App. 3 Cir. 6/29/94), 639 So.2d 864, 871, *writ denied sub nom. Thompson v. State ex rel. Dep't of Transp. & Dev.*, 94-2047 (La. 11/4/94), 644 So.2d 1052 (internal citations omitted). Before an appellate court may disturb an award of damages, the record must clearly show the trial court abused its broad discretion in making the award. *Lawrence v. City of Shreveport*, 41,825 (La.App. 2 Cir. 1/31/07), 948 So.2d 1179, *writ denied*, 07-441 (La. 4/20/07), 954 So.2d 166.

### *General Damages*

The trial court awarded Mr. LeBlanc $250,000.00 in general damages.

General damages are those which may not be fixed with pecuniary exactitude; instead, they involve "mental or physical pain or suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of life or life-style which cannot be definitely measured in monetary terms." *Kaiser v. Hardin*, 2006-2092 (La.4/11/07), 953 So.2d 802; *Nelson v. Southeast Food Inc.*, 39,157 (La.App. 2 Cir. 1/28/05), 892 So.2d 790. In the assessment of damages in cases of offenses, quasi offenses, and quasi contracts, much discretion is left to the judge or jury. La. C.C. art. 2324.1; *Kaiser v. Hardin, supra*. The role of the appellate court in reviewing awards of general damages is not to decide what it considers an appropriate award, but rather to review the exercise of discretion of the trier of fact. *Id.*; *Hae Woo Youn v. Maritime Overseas Corp.*, 92-3017 (La.9/3/93), 623 So.2d 1257, *cert. denied*, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). The initial inquiry is whether the trier of fact abused its vast discretion in assessing the amount of damages. *Kaiser v. Hardin, supra*; *Reck v. Stevens*, 373 So.2d 498 (La.1979). Only after finding that the trier did in fact abuse its great discretion may the appellate court resort to prior awards, and then only to determine the highest or lowest point reasonably within that discretion. *Kaiser v. Hardin, supra*; *Coco v. Winston Industries Inc.*, 341 So.2d 332 (La.1976).

*Ricks*, 968 So.2d at 870.

The City asserts this award of general damages is abusively high, citing past awards to support its position. However, each of the cases cited by the City are distinguishable. Further, "[o]nly after finding that the trier did in fact abuse its great discretion may the appellate court resort to prior awards, and then only to determine the highest or lowest point reasonably within that discretion." *Id.*

Mr. LeBlanc suffered a deep, penetrating wound on his right leg causing such excruciating pain it required strong narcotic medication, of which he has since been weaned off. The wound developed a deep infection that required surgery and the removal of tissue. Though the wound was sutured after, Mr. LeBlanc was left with significant scarring. He then was forced to undergo a second surgery in October 2016 due to the lasting pain caused by his injury and its failure to heal fully. After the surgery, Mr. LeBlanc's mobility was severely restricted, and his leg immobilized in a splint and later in an orthopedic device. His physicians have stated future surgery will also be necessary, again resulting in restricted mobility.

20

Mr. LeBlanc continues to experience pain, balance problems, and swelling of his leg, foot, and ankle. He asserts he has lost the ability to engage in recreational activities he enjoyed before the accident. As noted by the trial court, "[a]t best, his activities will be significantly limited by the pain and swelling in his legs." His experts testified that he will be unable to resume employment in his chosen field of carpentry. Experts for both sides agree he has some level of permanent disability, though they disagree about the extent of that rating. One of Mr. LeBlanc's treating physicians, who performed the surgery in October 2016, testified it would take a year and a half from that surgery for Mr. LeBlanc to achieve maximum medical improvement.

The trial court found that given the above and Mr. LeBlanc's young age of twenty-nine years, he can be expected to sustain damages for an extended time in the future. We find, based upon the record, that the trial court did not abuse its great discretion in its general damages award to Mr. LeBlanc. As such, we need not look to prior awards for determinations of permissible highest and lowest amounts.

### Special Damages

#### Past and Future Medical Expenses

"A plaintiff may ordinarily recover reasonable medical expenses, past and future, incurred as a result of the injury." *Lawrence*, 948 So.2d at 1187.

Mr. LeBlanc's wound was cleaned and sutured on the day of the accident. He developed a deep infection causing the wound to break open, so Dr. Weston Miller performed a debridement and secondary closure of the wound. Before he could do so, Dr. Miller had to remove gangrenous tissue, leaving a large scar. Mr. LeBlanc was referred to Dr. Darrell Henderson, a plastic and reconstructive surgeon, on July 6, 2016 because he was still having pain in his unhealed wound and because Dr. Miller felt he was developing a condition known as stenosynovitis, meaning the

21

tendons in Mr. LeBlanc's leg were stuck together, resulting in an inflammatory response and scar tissue formation causing clicking, popping, and crunching sounds known as crepitus. Dr. Henderson agreed and referred Mr. LeBlanc to a neurologist, Dr. James Domingue. Dr. Domingue found Mr. LeBlanc had tears in the nerve and an enlargement of the nerve known as a neuroma just below the inner ankle.

On October 4, 2016, Dr. Henderson performed a neurolysis, consisting of removing scar tissue from the nerves. He also prescribed physical therapy to try to increase the motion and strength of Mr. LeBlanc's leg and allow him to walk freely without the use of an orthopedic boot device. The trial court found Mr. LeBlanc had incurred medical expenses totaling $35,846.38 at the time of trial and that those expenses were reasonably incurred and necessary for the treatment of his injury. The City does not argue against the amount of past medical expenses awarded to Mr. LeBlanc. Based upon the foregoing, we find that Mr. LeBlanc's medical expenses were reasonable and affirm the amount of $35,846.38 in damages awarded by the trial court.

Mr. LeBlanc was also awarded $100,532.50 in special damages for future medical expenses. The substantive law governing Mr. LeBlanc's claims for future medical expenses necessary to treat and compensate for his injury was stated by the supreme court in *Menard v. Lafayette Insurance Co.*, 09-1869, pp. 12-13 (La. 3/16/10), 31 So.3d 996, 1006:

> Under Louisiana law, a tort victim may recover past (from injury to trial) and future (posttrial) medical expenses caused by tortious conduct. Frank L. Maraist & Thomas C. Galligan, Jr., *Louisiana Tort Law* § 7.02[1], 7-5(Michie 2009). The victim must, however, establish he incurred past medical expenses in good faith as a result of his injury and future medical expenses will more probably than not be incurred. *Stiles v. K Mart Corp.*, 597 So.2d 1012, 1012 (La.1992)(remanding for a determination of "an award for future medical expenses which the medical evidence established that plaintiff, more probably than not, will be required to incur"); Maraist & Galligan, *supra*, § 7.02[1], 7-5-7-6. A plaintiff shows the probability of future medical expenses with

22

supporting medical testimony and estimations of their probable cost. *Smith v. Municipality of Ferriday*, 05-755, pp. 11-12 (La.App. 3 Cir. 2/1/06), 922 So.2d 1222, 1231, *writ denied*, 06-0934 (La.9/29/06), 937 So.2d 860; *Highlands Ins. Co. v. Missouri Pacific R. Co.*, 532 So.2d 317, 324 (La.App. 3d Cir.1988), *judgment affirmed sub nom. Lee v. Missouri Pacific R. Co.*, 540 So.2d 287 (La.1989); *see also, Stiles*, 597 So.2d at 1012 (referring to future medical expenses established by medical evidence). Importantly, future medical expenses must be established with some degree of certainty. *Highlands*, 532 So.2d at 324. Nevertheless,

> [w]hen the record establishes that future medical expenses will be necessary and inevitable, the court should not reject an award of future medical expenses on the basis that the record does not provide the exact value of the necessary expenses, if the court can examine the record and determine from evidence of past medical expenses and other evidence a minimum amount that reasonable minds could not disagree will be required.

*Stiles*, 597 So.2d at 1012. The proper standard for determining whether a plaintiff is entitled to future medical expenses is proof by a preponderance of the evidence the future medical expense will be medically necessary. *Hoskin v. Plaquemines Parish Gov't*, 97-0061 (La.App. 4 Cir. 12/1/97), 703 So.2d 207, 211, *writ denied*, 98-270, 98-271 (4/3/98), 717 So.2d 1129.

Dr. Henderson testified in his deposition that Mr. LeBlanc has a neuroma in his lower ankle area that is tender and is bothered when rubbed by shoes. He feels that it is more likely than not that Mr. LeBlanc will require surgery to have the neuroma removed, consisting of excising the neuroma and inserting the end of the nerve into a bone in his lower leg. Dr. Henderson stated that he believes the neuroma is going to gradually worsen over time. Dr. Henderson notes that even with the surgery the neuroma would inevitably reform, but in its new location in the bone marrow canal, it could not be pressed or hit, causing more pain or inflammation.

The City's expert, Dr. Kenneth Odinet, stated he did not believe additional surgery would be medically necessary. He admitted that Dr. Henderson's recommendation would be an option but suggested a nerve graft as an alternative. Dr. Henderson acknowledges that the surgery he recommends would result in an

additional loss of sensation. The City argues that this would leave Mr. LeBlanc in a worse position than he currently is, but, as Dr. Henderson notes, causing the foot to be more numb is a reasonable payoff for decreasing chronic pain.

Dr. Henderson also stated that Mr. LeBlanc will need to wear compression stockings on his injured leg for the remainder of his life. The stockings presumably last about two months, and the court found each pair lasts Mr. LeBlanc twice as long as he only wears one stocking at a time.

Dr. Henderson further recommended semi-annual doctor visits and periodic EMG studies for the rest of Mr. LeBlanc's life. Dr. Odinet testified that he did not believe semi-annual visits would be necessary while simultaneously acknowledging that future doctor visits might be. He offered no insight into how often those doctor visits might be required if or when Mr. LeBlanc experienced problems.

Finally, Dr. Henderson testified that Mr. LeBlanc would need a membership to a gym that has a pool, as it would take the weight off of his leg and be the best way to perform most of his exercises. Though Mr. LeBlanc testified that prior to his injury he had a membership at a different gym, the trial court found that he also engaged in many other physical activities. The trial court's written reasons for judgment specifically state, "Inasmuch as he can no longer engage in these other activities, and he is forced to get his exercise under the low impact conditions afforded by a gym with a pool, the Court finds that an award of the future costs of a gym membership is appropriate."

The trial court found that as Dr. Henderson was Mr. LeBlanc's treating physician, his opinion was entitled to greater weight. It found that the need for future surgery had been established with sufficient certainty, as well as the other future medical expenses listed above. When there is conflict in testimony, including expert testimony, evaluations of credibility are for the trier of fact and should not be

24

disturbed upon review unless the record contains no reasonable basis, or the stated reasons of the expert are patently unsound. *Sportsman Store of Lake Charles, Inc. v. Sonitrol Sec. Sys. of Calcasieu, Inc.*, 99-201 (La. 10/19/99), 748 So.2d 417.

The trial court next deferred to the expertise of Dr. G. Randolph Rice, an economist, in setting Mr. LeBlanc's future medical expenses award and generally found the median figure of the range presented to be appropriate. "As a determination of fact, a judge's or jury's assessment of quantum, or the appropriate amount of damages, is one entitled to great deference on review." *Menard*, 31 So.3d at 1007.

It is a well-acknowledged fact that awards for future medical expenses are highly speculative and, therefore, "generally do not involve determining the amounts, but turn on questions of credibility and inferences, i.e., whose experts and other witnesses does the [factfinder] believe?" *Id.* at 1006.

> Notably, reasonable persons frequently disagree regarding the measure of damages in a particular case. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. "Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable."

*Id.* at 1007 (citations omitted). "Because the discretion vested in the trier of fact is so great, and even vast, an appellate court *should rarely disturb* an award on review." *Id.*

The trial court awarded Mr. LeBlanc a total of $100,532.50 for future medical expenses, including: $19,626.00 for future surgery and physical therapy; $14,288.50 for compression stockings for the remainder of his life; $24,105.00 for semi-annual doctor visits for the remainder of his life; $17,250.00 for EMG studies; and $25,263.00 for a gym membership at a club that includes a pool. We find that the

trial court had a reasonable factual basis for its award of past and future medical expenses in favor of Mr. LeBlanc.

*Past and Future Lost Wages*

Past and future lost wages are separate and distinct damage awards. *Fontenot v. Sw. Offshore Corp.*, 00-1722 (La.App. 3 Cir. 6/6/01), 787 So.2d 588, *writ denied*, 01-1913 (La. 10/12/01), 799 So.2d 504. In order to recover for past lost wages, a plaintiff must prove his past lost earnings and the length of time absent from work which is attributable to the injury caused by the defendant. *Id.* The trial court awarded Mr. LeBlanc $59,348.00 in past lost wages.

At the time of his injury, Mr. LeBlanc was employed as a carpenter. Mr. LeBlanc testified that when he began carpentry in 2008, he was earning $10.00 per hour. He worked other jobs but returned to full time carpentry in 2014 on jobs secured by his father and grandfather. He stated that his initial billing fee was $18.00 per hour but that it had been increased to $20.00 per hour as his skills and experience increased. Mr. LeBlanc introduced a pay stub that showed that at the time of his injury, he was earning $20.00 per hour on a job for the Vermilion Corporation, which is in line with his testimony.

Dr. Rice, the economist retained by the plaintiff, calculated Mr. LeBlanc's lost earnings at the time of trial to be $68,343.00. This number was based off of a forty-hour work week, fifty-two weeks a year, at the rate of $20.00 per hour. However, as the trial court noted, Mr. LeBlanc admitted that while he worked forty to forty-five hours per week, he typically only worked forty-two to forty-three weeks per year. Pursuant to this testimony, the trial court appropriately lowered Mr. LeBlanc's award for past lost wages from $68,343.00, based on annual earnings of $41,600.00, to $59,348.00, based on annual earnings of $36,125.00.

26

The City argues that Mr. LeBlanc failed to show any proof at trial that he earned his $20.00 per hour wage for forty-two weeks out of the year, while acknowledging that he was earning that wage on the job he was working at the time of his injury. Mr. LeBlanc's father, with whom he works, specifically testified that carpentry work was in high demand in late 2016 due to the excessive flooding in the area. Further, Mr. LeBlanc's Vocational Rehabilitation Expert, Mr. Sy Arceneaux, testified that the annual earnings amount calculated by Dr. Rice corresponded with what the statistics reported by the Bureau of Labor Statistics for the Lafayette, Louisiana metropolitan area show a carpenter of Mr. LeBlanc's age and experience would be expected to earn in the area.

> This court set forth the standard in determining past lost wages and stated that: "Lost wages 'need not be precisely proven, they must be shown with reasonable certainty.' " *Taylor v. Premier Ins. Co.*, 98-1935, p. 7 (La.App. 3 Cir. 6/30/99); 742 So.2d 35, 40 (citations omitted). "An award for lost past wages can be 'computed on the amount the plaintiff would have in all probability' earned had he been able to work." *Id.* at pp. 7-8; 40. (Citations omitted). This court has consistently held that a plaintiff's uncorroborated testimony is sufficient to prove lost wages as long as such proof is uncontradicted and reasonably establishes his claim. *Green v. Superior Oil Co.*, 441 So.2d 54 (La.App. 3 Cir.1983); *Richard v. Teague*, 92-17(La.App. 3 Cir. 5/4/94); 636 So.2d 1160, *writ denied*, 94-1934 (La.11/11/94); 644 So.2d 388. "It is well settled that factual conclusions of the trial judge particularly where the credibility of a witness is involved, are entitled to great weight and will not be disturbed upon appeal." *Charles v. Arceneaux Ford, Inc.*, 542 So.2d 846, 850 (La.App. 3 Cir.1989) (citations omitted).

*Skipper v. Berry*, 99-1433, p. 8 (La.App. 3 Cir. 3/15/00), 762 So.2d 56, 61-62 (alterations in the original).

The trial court found that the medical evidence presented demonstrated with reasonable certainty that Mr. LeBlanc's residual disability was causally related to the accident. The City argues strenuously that Mr. LeBlanc's tax returns for the years immediately preceding the accident do not support the trial court's award for past lost wages. On the other hand, Mr. LeBlanc's testimony concerning his earned

27

wages was not only uncontradicted but was specifically corroborated with pay stub evidence. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. *Menard*, 31 So.3d 996. As such, we find the trial court clearly had a reasonable basis for the award of past lost wages to Mr. LeBlanc.

Finally, the trial court awarded Mr. LeBlanc $524,595.00 for future loss of earning capacity.

> To recover an award for future loss of earnings, the plaintiff must present medical evidence that indicates with reasonable certainty that a residual disability causally related to the accident in question exists, which results in the plaintiff's inability to earn wages to the same extent he could have earned had he not been injured.

*Fontenot*, 787 So.2d at 593.

Mr. LeBlanc testified that while he is not totally disabled, standing or walking for more than a couple hours and anything involving high impact increases his symptoms. Further, his ankle swells if forced to make even a two hour drive to New Orleans. He also stated he has experienced balance problems, which have slowly improved.

The City argues that their expert, Dr. Odinet, would not place any work restrictions on Mr. LeBlanc other than a general one against climbing. However, Dr. Odinet acknowledged that Mr. LeBlanc will always have swelling in his leg that limits how much he can and cannot walk based upon the build up of fluid in his ankle. Dr. Odinet further testified that he did not test for balance problems that may have been caused by Mr. LeBlanc's injury, which may further limit certain jobs Mr. LeBlanc will be able to perform. Dr. Odinet specifically found Mr. LeBlanc had suffered a permanent partial disability of his lower right extremity; though he felt Mr. LeBlanc's impairment was only five to ten percent.

28

Alternatively, Dr. Henderson testified that in his opinion, Mr. LeBlanc would only be able to perform fully sedentary work with opportunities to rest and elevate his leg and that activities that caused more swelling and pain were too much and should be restricted. He stated that it would be best if Mr. LeBlanc doesn't have a job where he has to stand on his feet and testified that Mr. LeBlanc will have to choose the type of work he will perform very carefully. He unequivocally stated that Mr. LeBlanc cannot go back to carpentry. Dr. Henderson found that the permanent partial disability of Mr. LeBlanc's right lower extremity was thirty percent, to which Dr. Miller, another one of Mr. LeBlanc's treating physicians, agreed.

The trial court accepted the testimony of Dr. Henderson regarding Mr. LeBlanc's abilities when re-entering the labor force. The trial court specifically stated in its written reasons for judgment that it "accords greater weight to the opinions of the treating physicians." When opinions of expert witnesses differ, it is for the trier of fact to determine the most credible evidence and these determinations will not be overturned unless it is proven that the expert's stated reasons are patently unsound. *Fontenot*, 787 So.2d 588.

Next both the City and Mr. LeBlanc had vocational consultants testify regarding the types of sedentary jobs available to Mr. LeBlanc given his training and background. Mr. Arceneaux, Mr. LeBlanc's vocational consultant who tested and evaluated him, testified that earnings of $20.00 per hour or $41,600.00 per year is consistent for a carpenter based upon data provided by the Bureau of Labor Statistics for the Lafayette area. Given Dr. Henderson's recommended restrictions on Mr. LeBlanc's future employment, Mr. Arceneaux concluded that Mr. LeBlanc is unable to perform eighty-seven percent of all available jobs in the current labor market, including all of his prior work experience. He found that based upon Mr. LeBlanc's

29

experience, skills, and restrictions, he would be able to find entry-level, sedentary positions that would pay between $18,400.00 and $23,020.00 annually. Tiffany Harrington, the vocational consultant employed by the City, found available positions for Mr. LeBlanc with annual earnings between $18,800.00 and $20,880.00 were he to work full time, year-round.

Though the record contains testimony relating to the benefits of a functional capacity evaluation in determining Mr. LeBlanc's physical restrictions and future work ability, no such evaluation was ordered or provided. Further, though the City elicited testimony that retraining might improve Mr. LeBlanc's future prospects, there was no testimony regarding Mr. LeBlanc's potential to be retrained, the time and cost said training would involve, or to what extent retraining might improve his future earning capacity. Therefore, the trial court found based upon the evidence before it that Mr. LeBlanc's future earning capacity was most appropriately set at the median figure of $20,740.00, as was utilized by Dr. Rice in calculating Mr. LeBlanc's loss of future earning capacity.

The City again argues that Mr. LeBlanc failed to show that he was consistently earning $20.00 per hour. It argues that even though Mr. Arceneaux's research clearly shows the average annual earnings of carpenters with Mr. LeBlanc's experience and skill level, it is inequitable to attribute those earnings to Mr. LeBlanc based upon his past tax returns and his own testimony that he only worked forty-two to forty-three weeks a year. However, an award for future loss of earnings is speculative and cannot be calculated with absolute certainty. *Freeman v. Harold Dickey Transp., Inc.*, 467 So.2d 194 (La.App. 3 Cir. 1985). "Damages for loss of future earnings or loss of future earning capacity is based on the injured person's ability to earn money, rather than on what he actually earned prior to the injury." *Id.* at 196 (citing *Merrell v. State, ex rel. Dep't. of Transp.*, 415 So.2d 660 (La.App. 3rd

30

Cir.), *writ denied*, 420 So.2d 443 (La.1982)). Further, an injured plaintiff's future

ability to earn is not necessarily determined by actual earnings at the time of injury.

*Id.* As the trial court itself noted in its written reasons and the supreme court has

stated, "[e]arning capacity in itself is not necessarily determined by actual loss;

damages may be assessed for the deprivation of what the injured plaintiff could have

earned despite the fact that he may never have seen fit to take advantage of that

capacity." *Hobgood v. Aucoin*, 574 So.2d 344, 346 (La.1990).

> Because of the speculative nature of an award for future loss of
> income there is no right formula in arriving at an award. Rather, the
> trial court must exercise sound discretion and award an amount that is
> fair to both litigants while not being unduly oppressive to either.
> *Unbehagen v. Bollinger Workover, Inc.*, 411 So.2d 507 (La.App. 1st
> Cir.1982); *Viator v. Gilbert*, 253 La. 81, 216 So.2d 821 (1968). In
> reaching an award for lost wages the trial court should consider the
> following factors: the injured party's age, life expectancy, work life
> expectancy, any discount rate and inflation factor which may be
> applicable, the annual wage rate increase, probable future earning
> capacity, and the loss of future earning ability and capacity. *Unbehagen,
> supra*; *Rivers v. Schlumberger Well Surveying Corp.*, 389 So.2d 807
> (La.App. 3rd Cir.1980).

*Freeman*, 467 So.2d at 196.

Mr. LeBlanc was twenty-seven years old at the time of his injury and twenty-

nine years old at the time of trial. Based upon U.S. Department of Labor Statistics,

Dr. Rice testified that Mr. LeBlanc had a work life expectancy of 30.07 years. He

noted the difference between Mr. LeBlanc's future earning capacity and his pre-

accident earning capacity is $20,860.00. Using this information and a discount rate

of 2.5%, Dr. Rice testified that Mr. LeBlanc's projected future loss of earnings or

earning capacity was $604,101.00. The trial court found it appropriate to adjust

these calculations proportionately to reflect the difference caused by Mr. LeBlanc's

choice to only work forty-two or forty-three weeks a year rather than fifty-two, i.e.

base the calculations off of annual earnings of $36,125.00 rather than $41,600.00.

31

These adjustments result in Mr. LeBlanc's projected future loss equating to $524,595.00.

Before an appellate court can disturb award by trial court, the record must clearly reveal that the trier of fact abused its discretion in making its award. *Freeman*, 467 So.2d 194. Based upon the above information, we cannot say the trial court was clearly wrong in its findings and its award to Mr. LeBlanc. As such, we affirm the ruling of the trial court.

## Disposition

Based upon the foregoing, we affirm the judgment of the trial court finding the City of Abbeville liable for the defective condition of the subject storm grate and awarding Riley LeBlanc $970,321.88 in related damages: $35,846.38 in past medical expenses; $100,532.50 in future medical expenses; $59,348.00 in past lost wages; $524,595.00 in future loss of earning capacity; and $250,000.00 in past and future general damages. Costs of this appeal in the amount of $5,216.00 are assessed to the City of Abbeville. La.R.S. 13:5112.

**AFFIRMED.**